# SOUTHLAND COTTON OIL CO. et al. v. RENSHAW et al.

No. 21589. Opinion Filed March 24, 1931.

Rehearing Denied May 5, 7931.

H. C. Thurman, E. C. Chastain, and Byrne A. Bowman, for petitioners.

Gasper Edwards, for the respondents.

CULLISON, J. This is an original action by the Southland Cotton Oil Company to review an award of the Industrial Commission made July 8, 1930, to F. R. Renshaw, claimant herein.

December 26, 1929, claimant filed before the Industrial Commission his claim against the petitioners, alleging that while in the employ of petitioners on the 11th day of January, 1929, he sustained an accidental injury which resulted in the loss of his index finger of the left hand, for which he prays compensation.

The usual and proper notices were given as required by law. Sometime later (no date), respondents, petitioners herein, filed their motion requesting the Commission to place this cause on its docket to determine the extent of liability.

The case was heard July 8, 1930; at the conclusion of the hearing the Industrial Commission rendered the following judgment:

"Order.

"1. Claimant herein on, and prior to January 11, 1929, was in the employment of this respondent and engaged in hazardous occupation covered by and subject to the provisions of the Workmen's Compensation Law;

"2. Arising out of and in the course of said employment, claimant, on January 11, 1929, while relieving and assisting an employee of the respondent Southland Cotton Oil Company, sustained an accidental personal injury which resulted in his temporary total disability from the date of said injury to July 16, 1929;

"3. The average wage of claimant at the time of his said injury was $3.50 per day.

"The Commission is of the opinion, on consideration of the foregoing facts, that claimant is entitled to compensation at the rate of $13.46 per week computed from January 16, 1929, to July 16, 1929, for the tem-

porary total disability hereinbefore mentioned.

"It is therefore ordered: That within ten days from this date, respondent, or its insurance carrier herein, pay to this claimant the sum of $347.72, being compensation computed from January 16, 1929, to July 16, 1929, or 25 weeks and 5 days' compensation at the rate of $13.46 per week in payment for the temporary total disability suffered by this claimant as a result of the aforementioned accidental injury.

"It is further ordered: That within 30 days from this date, respondent, or insurance carrier herein, file with the Commission proper receipt or other report evidencing compliance with the terms of this order."

The proper appeal bond was executed and the respondents bring the cause to this court for review. Petitioners present the following assignments of error:

"Assignments of Error.

"1. That the Commission's finding that the claimant was in the employment of the respondent, when injured, is not reasonably supported by the evidence.

"2. That the Commission's finding that claimant's injury resulted in his temporary total disability from the date of said injury to July 16, 1929, is not reasonably supported by the evidence.

"3. That the Commission's opinion therein that claimant is entitled to compensation at the rate of $13.46 per week, and the Commission's order therein requiring respondent or its insurance carrier to pay compensation at that rate from January 16, 1929, to July 16, 1929, is not reasonably supported and justified by the evidence.

"4. That said order and award is contrary to law and the Commission was without jurisdiction to make same.

"5. That said order and award is not reasonably supported by the evidence."

The employer, the Southland Cotton Oil Company, is a corporation, doing business in Oklahoma City, Okla., and together with the insurance carrier will be referred to as petitioners. F. R. Renshaw, employee, will be referred to as the claimant.

The bone of contention in this case may be denominated "employment," and involves the subject "Master and Servant," or "Employer and Employee."

Section 5, ch. 61, Session Laws of Oklahoma 1923, defines "employment" as follows:

"Employment includes employment only in a trade, business, or occupation carried on by an employer for pecuniary gain."

The Commission in awarding compensation to the claimant made the following finding of fact:

"The claimant herein, on and prior to January 11, 1929, was in the employment of this respondent and engaged in hazardous occupation covered by and subject to the provisions of the Workmen's Compensation Law."

The petitioners contend that claimant was not in their employment at the time of his injury, and therefore assign as error:

"That the Commission's finding that the claimant was in the employ of the respondent when injured is not reasonably supported by the evidence."

We deem it important at this juncture to set out in narrative form the pertinent facts as disclosed by the testimony of claimant and petitioners.

Claimant, F. R. Renshaw, testifies on direct examination:

"Q. Who were you employed by on or about January 11, 1929? A. Well, I was—a boy asked that I release the shift pans and he went out and I relieved him until he came back, you see. Q. Were you employed by the Southland Cotton Oil Company? A. Yes, sir. Working for Sylvester. Yes, sir. Q. Did you receive an injury while working for your employer? A. Yes. Q. Did you get hurt while employed by the Southland Cotton Oil Company? A. Yes, sir. Q. What was the nature of the injury? A. The finger; cut my finger. Q. How did you cut it? A. In the machine; I cut it in the machine. Q. The index finger of the left hand? A. Yes. sir. Q. What wages were you receiving? A. $3.50 per day. Q. The superintendent ordered you to be taken to a doctor? A. Yes, sir. Q. How long did the doctor treat you? A. I think it was—let's see, I ain't for sure, but I think two months. I ain't for sure. Q. How long were you disabled from work, due to this injury? A. Well, let's see—Well, about eight months, I think. Anyhow, about 8 months. Q. Did you ever receive any compensation? A. No, sir."

Claimant testifies on cross-examination:

"Q. Renshaw, what date was it you were hurt? A. 11th day of January, 1929, I think. Q. Where were you? What place? A. In the oil mill. Q. Whose oil mill? A. Southland's. Q. How long were you in there when you got your finger hurt? A. No quicker than I walked in and the boy asked me to release (relieve) him. Q. You just helped out? A. Sure, I just helped out. He went out somewhere. We always help out that way. Q. Where did you come from? A. Southwestern Cotton Oil Mill. Q. Where? A. Southwestern. Q. That's where you were working? A. Yes, sir. Q. You work reg-

ularly at the Southwestern? A. Yes, sir. Q. Then you were not employed regularly at the Southland? A. No, not more than some—this boy asked me—he said he wanted me to work there. Q. Who told you that? A. Sylvester. Q. You took Sylvester's place? A. Yes. Q. How much did he pay you for doing that? A. He don't pay me nothing. Q. What were you working for? A. He just asked me to work in his place while he went out. Q. What time do you usually quit over at the Southwestern mill? A. I was working at night then. Q. You were working regularly at night? A. Yes, sir. Q. How much were you making? A. $3.50. Q. Then you were not working for the Southland at all? A. No, sir. Q. You were not on their pay roll—the Southland? A. No, sir. Q. You were not working for them? A. No, sir. Q. Anybody hire you? A. No, sir. Q. They were not paying you anything—the time you got hurt? A. No, sir. Q. And you were not on their pay roll? A. No, sir. Q. And nobody hired you to work for them? A. No, sir. Q. Sylvester was just an employee, he was just another colored man there? A. Yes, sir. Q. Did the superintendent or Mr. Tinsley or anybody in authority ask you to work and help out Sylvester? A. No, sir. Q. They did not hire you? A. No, sir. I was working in the other boy's place, you see. Q. Now, there are two oil companies? A. There is three. Q. Do you work in all three? A. At different times, some. Q. Well, there is the Southwestern and the Southland? A. Yes, sir. Q. And you worked at the Southwestern at night and the Southwestern is not the same one—is not the same plant in which you hurt your finger. That is the Southland and you did not have a job at the Southland? A. Not only just working for this boy, working in his place. Q. Nobody hired you? A. No, sir. Q. Did not get any money? A. No, sir. I don't go in for it. I didn't go back."

Claimant further testifies upon cross-examination by this court:

"Q. You filed out your claim, notice of injury, to the Commission that you were working for the Southland Cotton Oil Company? A. No, sir. It was not that way. I was working for the Southwestern. Q. You testified under cross-examination that you just went down to the Southland Oil Company and walked in and relieved an employee of the Southland? A. Yes, sir. Q. Then your notice of injury to the insurance company is not correct wherein it states that your employer was the Southland Cotton Oil Company? A. That's not the way—the place it was. I was not working for the Southland. That's how I happened to be there. Q. Mr. Renshaw, you were employed by the Southwestern Cotton Oil Company? A. I was—yes, sir, Southwestern. Q. For the Southwestern? A. Yes, at night. Q. You were working night shifts? A. Yes, sir.

Q. You testified on cross-examination that you had worked at the Southland Oil Company at different times during the day time? A. No, I said I would pass by and they would ask me and I would help the other boys. Like he would come over at night and help me. He would come over and relieve me and you see—I would go over there and help him out. I used to shift pans if he wanted to go off for awhile. He paid me something. We swapped the work there for about seven years."

T. O. Tinsley, called as a witness, testified as follows:

"Q. State your name, please. A. T. O. Tinsley. Q. Where do you live? A. Oklahoma City. Q. Employed here? A. Yes, sir. Q. By what company? A. Southland Cotton Oil Company. Q. What capacity? A. Superintendent. Q. In such capacity is it your job to hire and fire men? A. Everything outside of the office. Q. Do you know 'Flaggie' Renshaw? A. Yes. Q. White or colored man? A. Colored Q. Ever work for the Southland? A. Yes. Q. More than one time? A. Yes, more than once. He worked a time or two, two or three times I will say since 1924 on various occasions. Q. You know the facts concerning the accident? A. I do. Q. Will you just state the facts, please sir? A. Well, I will start at the beginning. The first I recall of it was when my meal cook came out and said one of the boys had an injury. I was out on the cotton dock, loading some cotton, and I went in and this boy was there. I did not know he was on the place and I said I asked him what he was doing there and he said he had been working in there and I told him to get outside, and I called the truck driver, and I told him to take him to the doctor and get his finger treated, and I said, 'Come back in the morning and the bookkeeper and cashier would make out his compensation papers.' Q. Was he on the payroll at that time? A. No. Q. Had you hired him? A. No, I didn't know he was in the mill. Q. Do you know who he was relieving at the time he was hurt? A. Sylvester Anderson. Q. Did he have any right to hire Renshaw? A. No. Q. And the company had no idea of paying him for what he did? A. No. Q. And did not pay him? A. No."

T. O. Tinsley continues his testimony under cross-examination by the court:

"Q. And you have an assistant? A. No, I have a meal cook. He has nothing to do with the hiring and firing of labor. Q. Does he order the men to do their work? A. No. Q. Mr. Tinsley, is it possible for a man to come in the mill and relieve another man and perform work there without your having knowledge of it? A. Yes, sir. Q. Did you ever see this claimant around the mill? A. Yes, sir. Q. After he was working there at the Southwestern Company? A. Yes. I

have seen him there. He has come over and he has worked for me. As I said and I tried to get the boy to work for me and he said he had another job. He didn't say where. Q. You had seen him? A. Yes; not in the press room, though, but every time he came by he had a word with me."

We are now concerned with the question, "When does the relation of master and servant arise?"

It is a well-settled principle of law that:

"The relation of master and servant arises out of contact; the assent of both parties is essential; hence the relation does not arise between employees and one who has made advances to, or guaranteed the accounts of, the business in which they are employed, or even one who has agreed with the owners to pay the salaries of the employees." 39 Corpus Juris, sec. 2, p. 34.

Again:

"The fact that a servant performing services for his master has entered into an agreement with a third person, by which it is provided that he is to be deemed, while so engaged, the servant of the latter, cannot alter the real relationship between him and his employer." Master & Servant, sec. 2, vol. 39, p. 34, Corpus Juris.

"As a general rule, every person of the full age of 21 years, and not under any legal disability, is capable of becoming either a master or servant. But, in order that a contract of hiring and service may be legally binding, it is necessary that at the time such a contract is entered into, the party about to be hired should be free from any other engagement incompatible with that which he is about to enter. In other words, he must be sui juris. Every person has a legal right to dispose of his own labor as he wishes and to work for whom he pleases. The employer also has the right freely to contract, the right to select his employees and to decide when to engage them." Master & Servant, sec. 3, vol. 39, Corpus Juris.

"Except as may be otherwise required by the statute of frauds, a contract of employment out of which the relation of master and servant may arise may be either express or implied, verbal or written. But the relation cannot be imposed upon the employer without his consent, and, although the assent of the employer may be implied, a mere volunteer does not become a servant by reason of the fact that he rendered services. However, one who is allowed to work in connection with the carrying on of a business and is given reason to believe, and bona fide believes, that he is employed in that business, has a right to treat himself as an employee." Master & Servant, section 10, vol. 39, Corpus Juris.

As to the latter proposition we quote from the case of Hitchcock v. Artic Creamery Co., 170 Iowa, 352. The court in that case held that there was evidence from which it might be inferred that the railroad company had knowledge that the services were being rendered by plaintiff and the question of the relation of master and servant should have been submitted to the jury.

It will be remembered that the Commission in the instant case found the claimant was in the employ of the petitioners.

It is true, however, that many of the states have held that:

"A person who voluntarily assumes to act as the servant of another cannot recover for personal injuries as though he were in fact a servant. * * * On the other hand, the fact, that a person is a volunteer does not deprive him of his right to be protected by the same degree of care which the master owes to other strangers."

The relation of employer and employee, under our Workmen's Compensation Act, may arise by implied contract, such as by knowledge and acquiescence of the employer in services performed by employee.

We have called attention to the general rule of law that the relation of master and servant arises out of contract, supra.

It is also a well-settled principle of law that the contract of employment "may be either express or implied, verbal or written." We are not unmindful of the rule of law that:

"Although the assent of an employer may be implied, a mere volunteer does not become a servant by reason of the fact that he has rendered services."

However, it is equally well settled that:

"One who is allowed to work in connection with the carrying on of a business and is given reason to believe, and bona fide believes, that he is employed in the business, has a right to treat himself as an employee."

On the question of substitutes, it is a well-settled rule of law that:

"A substitute employed by a servant in accordance with a custom permitting such hiring, or with the implied knowledge of the master or his subsequent ratification, is entitled to the same protection as the servant and is bound by the terms and conditions of his predecessor's contract." Sec. 9, Master & Servant, vol. 39, Corpus Juris.

In Howard v. Wabash Truss Hoop Co.,

147 Ill. App. 216, the first paragraph of the syllabus reads as follows:

"Where a company conducts its business in such manner as to suffer appearances to exist and allows its manager and agents to so act as to give one employed to do work in connection with the carrying on of its business, reason to believe that he is employed by the company, and where such one in good faith does so believe, then he has a right to regard the company as his employer and to hold it bound as such."

We accept as true the contention of the petitioners that the claimant in the instant case was a volunteer. We add, however, that he was also a substitute having been invited by a regular employee of petitioners who was performing labor for petitioners; that regular employees of the cotton mill were permitted under some circumstances to hire and substitute other persons in their stead when necessity demanded it. And that said petitioners knew and permitted said practice obtained at and before the time of the accident to this claimant, but this fact alone will not prevent the claimant from recovering compensation for his injury.

This court has said in the case of Hamilton v. Randall, 136 Okla. 170, 276 Pac. 705, in the first paragraph of the syllabus:

"Our Workmen's Compensation Law is remedial in its objects and operation and should receive a liberal construction in favor of those entitled to its benefits."

In the case of Rook v. Shultz (Ore.) 198 Pac. 234, in a case similar to the one at bar, the court said:

"But while a volunteer may not recover on the basis of service, he yet may be entitled to the exercise of that degree of care owed to persons rightfully on the premises of the employer, and may found his right to recover on the general principles of negligence."

In the case of Kali Inla Coal Co. v. Ghinelli, 55 Okla. 289, 155 Pac. 606, the court said in the 7th paragraph of the syllabus:

"Where a master, from custom, permits his servants to substitute another person temporarily in his stead, such substituted person is the employee of the master, and the master owes to such substituted person during such temporary services the same degree of protection as he owes to his regularly employed servant."

The Supreme Court of Iowa, in the case of Aga v. Harbach, 117 N. W. 669, said, in the 1st paragraph of the syllabus:

"Where plaintiff, with the knowledge and consent of defendant's superintendent in general charge of his factory, was employed by an engineer as his substitute during a temporary absence, defendant was charged with a knowledge of such employment and with the same duties toward plaintiff as toward other employees, including the duty to furnish him with a safe place to work and to warn him of any dangers incident to the employment not obvious or known to him."

General rules:

"The master is, where the relation of master and servant exists, liable to the servant for personal injuries sustained by him, and which have been incurred by him while he is within the course and scope of his employment, by reason of the master's negligence; the duty of the master arises by operation of law from the relation of master and servant, and not out of the contract of employment. * * *" Sec. 381, vol. 39, Corpus Juris, on the subject "Master and Servant."

"It is by no means necessary that the duty, violation of which may constitute actionable negligence, shall arise out of contract, but it may be a legal duty which may arise in various ways,—it may be a duty prescribed by statute or ordinance,—a common law duty,—or a duty imposed by implication of law or operation of law. The duty may arise from the relation or situation of the parties. * * *" Sec. 18, "Negligence," vol. 45, Corpus Juris, p. 643.

"While it has been stated in a general way that liability for negligence exists only where there is privity between the person injured and the one whose act or omission has caused the injury, the term 'privity' is used in the sense of a relation which creates obligation, and its meaning is not necessarily confined to privity of contracts. * * *

"Privity of contract is not necessary where the duty which was breached, although connected with the subject-matter of contract, was not created by contract, as in the case where one has been employed to perform certain work is guilty of such negligence in connection with the provision thereof as to cause injury to a person other than his employer, or where the thing dealt with is inherently dangerous. * * *" Sec. 22, "Negligence," vol. 45, Corpus Juris, p. 649.

The above rule of law is plainly manifest in our Workmen's Compensation Act.

We have very carefully read the entire record in this case and find therefrom: That the Southland Cotton Oil Company, employer herein, is in the business of employing laborers to work in their cotton oil

mill; that the claimant while performing labor for the employer in said cotton oil mill sustained an accidental injury arising out of said employment; that said employer was well acquainted with the claimant having on several occasions attempted to employ the claimant to work for him; that in fact claimant had at various times and at the request of said employer performed work in said mill for said employer; that the claimant had on various occasions voluntarily performed labor for the employer at the request of regular employees in said mill; that the performance of said labor by said claimant as a volunteer, or substitute, was well known to said employer; that immediately after claimant was injured the employer came into the mill and upon seeing the injured claimant directed his men to take the claimant to the hospital for treatment and directed the claimant, when he had been sufficiently treated, to return to the mill, present himself to the cashier and bookkeeper of the company, and they would settle with him.

Keeping in mind the evidence and the law of the case, we conclude and hold: That the petitioners are liable in damages to the claimant in the amount of compensation awarded to the claimant by the Industrial Commission. The Commission having found that the claimant did sustain an injury while working for the petitioners at the time alleged, and the court further finding and holding that the Commission properly based the amount of the award of compensation to claimant on the law in such case made and provided, and the court having held the petitioners liable to claimant in damages caused by said injury, we deem it unnecessary to further pursue other objections raised by the petitioners.

The award of compensation allowed to the claimant by the Industrial Commission is in all things affirmed.

LESTER, C. J., CLARK, V. C. J., and ANDREWS and McNEILL, JJ., concur. RILEY, SWINDALL, and KORNEGAY, JJ., dissent. HEFNER, J., absent.