JOHN A. BROWN CO. v. CLAUSE.

No. 34005.    June 12, 1951.

Rehearing Denied July 17, 1951.

Second Petition for Rehearing
Denied Sept. 25, 1951.

*235 P. 2d 680.*

Looney, Watts, Ross, Looney & Smith,
Oklahoma City, for plaintiff in error.

Butler & Rinehart, Oklahoma City,
for defendant in error.

JOHNSON, J.   The parties herein occupied reverse relative positions in the trial court, and hereafter they will be referred to as they there appeared.

Plaintiff filed her petition alleging that on or about the 27th or 28th of December, 1945, she was lawfully in defendant's store for the purpose of conferring with defendant's credit department with respect to obtaining credit on certain merchandise which she had purchased from and returned to defendant; that she was advised to discuss the matter with defendant's agents, and that as she approached the desk of defendant's agent in said credit department, defendant's agent, a Mrs. Morgan, directed her to have a seat in a chair adjoining her desk; that when she was in the act of seating herself in said chair, Mrs. Morgan negligently and carelessly pulled the chair from beneath her causing plaintiff to fall backward upon the floor; that as a result thereof plaintiff's hip was sprained and an arthritic condition which was at the time in an arrested or inactive condition was reactivated and aggravated; that by reason of the injury plaintiff suffered great pain which she endured for a long time, and it was necessary for her to be hospitalized and secure surgical and medical treatment; that she lost the use of her leg and was unable to walk without the aid of crutches, and her health is so impaired that she is unable to work. She alleged that she was 49 years of age at the time of the injury, in good health and had an earning capacity of $1,000 per year, and prayed judgment and damages for pain and suffering, medical expenses incurred in connection with her injury, hospitalization and loss of earning capacity, in the total sum of $33,991.95.

For answer to plaintiff's petition, defendant denied any negligence on its part, pleaded contributory negligence, and further pleaded that the conditions at the time and place were open and

obvious; that the plaintiff's disability, if any, was caused by an old condition of arthritis, and that by reason thereof there was no liability on the part of defendant.

Upon the issues thus joined, trial was had to a jury which rendered a verdict in favor of the plaintiff in the sum of $19,812.12. Defendant's motion for a new trial was overruled, and defendant appeals.

Defendant under its first proposition asserts that the court erred in failing to instruct the jury on the defendant's theory of the case and in failing to give defendant's requested instructions Nos. 6 and 9 which it claims covered its theory of the case, and in support of this contention asserted that the rule is well settled in this jurisdiction that a party to litigation is entitled to have his theory of the lawsuit submitted to the jury under proper instructions, if there is any evidence to sustain it. Citing, Mountcastle v. Miller, 66 Okla. 40, 166 P. 1057; Southwestern Bell Tel. Co. v. Ward, 200 Okla. 315, 193 P. 2d 569; City of Tulsa v. Harman, 148 Okla. 117, 299 P. 462, and other cases, with quotations from the Harman case. The rule announced therein and relied upon herein is:

"The duty to keep premises reasonably safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee and would not be observed by him in the exercise of ordinary care.

"The invitee assumes all normal or ordinary risks attendant upon the use of the premises, and the owner or occupant is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers, nor is he liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of ordinary care. 45 C. J. 837 Par. 244"

The proffered instructions are as follows:

"No. 6

"You are instructed that the plaintiff assumes all the normal or ordinary risks attendant upon the use of the particular premises where this accident occurred and that the owner or occupant of said premises is under no duty to reconstruct or alter the premises so as to obviate known or obvious dangers, nor is the owner liable for injury to the person in the position of the plaintiff resulting from injuries which are so obvious to her as they would be to the defendant and which she should have observed if she had been in the exercise of due care."

"No. 9

"You are instructed that where there is a safe method of performing a certain act and also an unsafe method and the plaintiff adopts the unsafe method he is not entitled to recover against the defendant who has provided a safe method. And in this connection if you find and believe from the evidence in this case that there was a proper chair for this plaintiff to sit in, which was facing in the right direction, and instead of using that chair she attempted to use a chair which was not pointing in the right direction then and in that event she cannot recover and your verdict should be for the defendant."

The defendant argues that under the pleadings and evidence adduced, it was the mandatory duty of the court to give these instructions or others of similar import.

In this connection the answer of the defendant alleged:

"Defendant states that the premises and condition thereof where plaintiff fell were open and obvious to plaintiff, that nothing was concealed from her and she fully assumed the risk of possible injury, by reason whereof plaintiff is precluded from recovering against this defendant."

The evidence relied upon to justify the giving of such instructions consists of witnesses' description of the room where the accident occurred, together with pictures of the room and furniture, which showed that all such con-

ditions were open and obvious and had remained the same for a long period of time before the accident occurred; that the plaintiff testified that she went to the office every month to pay her bill; that she had been to the particular place where this accident happened in the summer prior to the accident, and that the room was the same now as then.

The evidence discloses that the plaintiff went to the office of the credit department of the defendant for the p u r p o s e of getting a credit item straightened out; that the office was a large room with seven employees, called interviewers. Each interviewer had a desk. An information desk was located near the entrance to the room where the customers state their business to an employee of the defendant who advised them which interviewer to see; that plaintiff was advised that Mrs. Morgan, one of the interviewers, would take care of her. Mrs. Morgan was then busy with two ladies at her desk; one was a customer and the other a companion of the customer. Plaintiff was advised by the employee at the information desk to have a seat and wait. Thereafter, Mrs. Morgan, the interviewer, informed plaintiff that she was next. The two chairs which had been occupied by the two ladies who preceded plaintiff were still near Mrs. Morgan's desk. Mrs. Morgan arose and shoved one chair back. She then put her hand on the other chair, straightened it around and said, "Have a seat."

Plaintiff thereupon attempted to sit down in the chair indicated, and just as she was in the act of doing so, Mrs. Morgan pulled the chair away from her. Thereupon, plaintiff fell upon her right hip and sustained the injuries for which the damages were sought.

The requested instructions of defendant were evidently prepared under the theory that the danger to plaintiff was visible, and such that no warning was needed to call to her attention the condition or position of the chair, and that by placing herself in the position in which she did prior to her injury, she violated the plainest laws of nature, laws learned in childhood; that by reason thereof she was guilty of contributory negligence and barred from recovery. Harman case, supra. But no complaint of the condition of the premises was made by plaintiff. She complains only of the negligence of the defendant's employee in carelessly and negligently removing the chair, which she thought was offered to her. No conflicting testimony was offered on this issue; in fact, the only issue involved was as to the negligence of defendant through its agent, Mrs. Morgan, and the contributory negligence of plaintiff. No complaint is made of the instructions on these questions. The instructions as given reasonably and fairly presented the issues in the case to the jury.

The requested instructions covered no material issue in the case. Therefore, the trial court properly refused requested instructions which, although correct abstract statements of law, were not applicable to the issues before the jury.

In defendant's second proposition it is urged that the verdict of the jury was excessive, and by the amount of the verdict passion and prejudice are indicated, and that by reason thereof a new trial should have been granted.

The well established general rule is that unless there has been an abuse of discretion, the trial court's ruling on a motion for a new trial court's ruling on that the damages are excessive will not be reviewed. 5 C. J. S., Appeal and Error, §1626; Jordan Bus Co. v. Garnand, 203 Okla. 623, 225 P. 2d 173; Bucktrot v. Partridge, 130 Okla. 122, 265 P. 768. This court in the Bucktrot case, supra, followed the rule announced by Chancellor Kent, and in the syllabus, paragraph No. 3, said:

"In a suit for damages for personal injuries, before a verdict of the jury will be set aside as excessive, it must appear that the verdict is so excessive as to strike mankind, at first blush, as being beyond all measure unreason-

able and outrageous and such as manifestly shows the injury to have been actuated by passion, partiality, prejudice, or corruption."

Here, as in the Bucktrot case, supra, defendant cites numerous cases to sustain its contention, and the similarity of the fact situation there to the case at bar prompts us to quote as apropos a part of the opinion therein, which is:

"It will be observed, however, that the authorities cited are opinions written several years ago, and this court will take judicial notice of the fact that the purchasing power of a dollar is much less today than it was a few years ago; that the earning capacity of a man or woman is much more today, when measured in dollars and cents, than it was a few years ago, and the tendency during recent years is toward allowing much larger verdicts to stand than were permitted a few years ago.

"There is no evidence in the record to indicate passion and prejudice toward defendant on the part of the jury, and, unless we are able to say by the amount of the verdict alone that such existed, we must overrule this assignment of error."

It was stipulated that plaintiff was 49 years old and had a life expectancy of 21.63 years.

It was shown that plaintiff when injured had an earning capacity of $1,000 a year; that she had incurred or expended the sum of $3,012.12 for doctors and nurses' services and hospital and medical bills; that she underwent X-ray treatment and surgery for relief from the aggravated condition of her hip caused from the injury. In this connection Dr. Don H. O'Donoghue, a bone and joint specialist, whose qualifications were admitted, after outlining his various examinations of X-rays of plaintiff's hip and general condition, testified as follows:

"Q. In other words, from the time—from 1942 on to 1945, there wasn't any change in your opinion, any appreciable change? A. Little or no change.

"Q. Then, from the summer of 1945, after she had the injury, you find a progression or narrowing of that joint space; is that correct, sir? A. That is correct.

"Q. Now, you took her under your treatment at that time, didn't you? A. Yes, sir.

"Q. What was the first kind of treatment you gave her? A. There was a good deal of discussion as to whether it would be the best thing—what would be the best thing to do. You understand in this type of case, I discussed with Miss Clause the advisability or possibility of various things we could do. I suggested to her then that I thought—do you want this? Q. Go right ahead.

"A. I thought probably that ultimately she would have to have her hip made stiff so it wouldn't hurt her, but there were other things we could do to try to avoid that. She elected to try the things that we could do, which would improve it, so the first thing we did, we put her in the hospital and put traction on both of her legs. She had gotten to walking with a tendency to cross her knees when she walked, and so that was increasing, and we had to do something to try to get her knees apart. We put her in bed with weights on both legs and gradually tried to pull her legs to the corners of the bed; that is, separate her knees by gradual traction.

"Q. Was that successful, Doctor, that character of treatment? A. Well, yes and no. It was successful to the extent we were able to separate her knees some, and she was relatively pain-free in traction. She and I both felt very encouraged about it, but as soon as she got up, she began to have a recurrence of the pain in her hip so that I would say that it was not a success in its final analysis.

"Q. What was the next thing you advised or took under consideration to do for her? A. We had her under observation for a considerable period of time, particularly with reference to the hip joint. It seemed to me to be gradually getting worse, as revealed in the X-rays. That is manifested in the X-ray by further narrowing of the joint space

and by absorption of bone, so she was getting a very little joint. In the meantime, her knee had moved further forward, the mid-line, and again we had quite considerable discussion, and I told her we could operate her and angulate the bone in such a way that we would get a new place to bear weight on; that is, instead of bearing weight on this rough and irregular chewed-up area, we could move the head around some and get her to bear weight where the weight normally should be borne, which is on top of the head, rather than on the rim of it. She was quite agreeable to that, that is, she accepted the surgery, and she was operated in June of 1946.

"Q. Now then, Doctor, in that operation you performed in June, 1946, on Miss Emma Clause, tell the jury, just in language we can understand, or I can understand, ordinary lay language, exactly what you did. A. I can show you on the picture. That would be easier.

"Q. What was the first thing you did with reference to putting her — after putting her in the hospital? A. You mean after that traction?

"Q. Yes, sir. The operation. A. We made an incision down the side of her thigh; exposed the bone, thigh bone, below her hip, and then with chisel and hammer, just cut it in two about an inch or so below the hip, and then you understand the hip and thigh bent inward, and in order to get it outward, then, we angulated or bent it at the place where the cut was, so the bone, instead of being straight, made an angle of it of about 30 degrees."

He further testified:

"Q. And did this, in turn, when that crush from the fall occurred to that hip, in that condition, did it cause and bring about the pain? Did that bring about and cause the pain in the hip? A. I think that, together with the fact that it lighted up her arthritis, caused her to have pain in the hip; yes.

"Q. Now, then, Doctor, was all the medical treatment that you did for Miss Emma Clause following 1946, when you first saw her, on reference from Dr. Goldfain, in your opinion, attributable

to and brought about and caused by this fall she had in Brown's Store, of which you received a history? A. I think that was the immediate cause of the treatment being necessary when it was; yes, sir.

"Q. And was that the immediate cause of the pain which she had, and from which she was suffering at the time you saw her? A. Yes, sir."

In answer as to the cause and permanency of the injury, he testified:

"Q. Now, then, Doctor, assuming that this lady had been seriously ill in 1930 to 1940, and in 1940 she was seriously ill up to 1942, when Dr. Goldfain saw her the last time, and then she took employment at such work as clerk in the Park-O-Tell, and candy wrapper at Beverly's, and that she was able to get about and walk relatively free from pain, unless she twisted her ankle or moved her leg in an unusual fashion; and that then in 1945—December 27 or 28, 1945, she fell in Brown's Store, when a chair was removed from where she thought she was going to sit down, and that thereafter, she had pain in the hip and finally came to you in the condition she was in in January or February, when she came to you; is it your opinion that that fall was sufficient and was the producing cause of the condition in which you found her? A. Yes. . . .

"Q. Based upon your experience as an orthopedic surgeon and in orthopedic work, and your knowledge of this woman's case; is that right? A. Right.

"Q. Doctor, the injury that is there, or the condition that is there at the present time, is that a permanent condition? A. Yes."

Dr. Goldfain, plaintiff's family physician, testified substantially as did Dr. O'Donoghue.

The evidence of plaintiff and her physicians and others witnesses was sufficient to establish the negligence of defendant and the elements of damage and amount thereof claimed by the plaintiff.

It was the function of the jury to properly evaluate these matters. It was

in a position to see the plaintiff and the witnesses and in a better position to evaluate the damages than this court on appeal.

The question of excessive damages was raised by defendant in its motion for a new trial, and after due deliberation, the motion was overruled without any reduction of the recovery allowed by the jury, and the same question is raised in this appeal.

What elements of damages are proper and measure of damages are questions of law, but generally the amount of damages is a question for the jury. 25 C. J. S., Damages, §176.

Applying the rules announced herein, we find no error, and, therefore, the judgment is affirmed.

ARNOLD, C.J., LUTTRELL, V.C.J., and CORN and DAVISON, JJ., concur. HALLEY, J., concurs except as to amount. WELCH, GIBSON, and O'-NEAL, JJ., dissent.

WELCH, J. (dissenting). I think the court committed reversible error in violating the well established rule requiring that the defendant's theory of defense be presented to the jury by appropriate instruction duly requested by defendant when there was evidence tending to establish such defense.

I am authorized to say that GIBSON and O'NEAL, JJ., concur in this dissent.