INDEPENDENT - EASTERN TORPEDO CO. v. PRICE.

No. 34522. March 10, 1953.

Rehearing Denied May 12, 1953.

Application for Leave to File Second Petition for Rehearing Denied June 9, 1953.

*258 P. 2d 189.*

634

635

Draper Grigsby, Oklahoma City, and G. C. Spillers and G. C. Spillers, Jr., Tulsa, for plaintiffs in error.

Clyde G. Pitman and George Defenbaugh, Shawnee, for defendant in error.

JOHNSON, V.C.J. This is an appeal from the district court of Pottawatomie county, Oklahoma, from a verdict of a jury and judgment based thereon, awarding defendant in error $65,000 for personal injuries allegedly sustained by him through the negligence of the plaintiffs in error.

The parties herein occupied reverse relative positions in the court below and hereafter will be referred to as they there appeared.

Plaintiff, inter alia, alleged in substance that he was a resident of Pottowatomie county, Oklahoma; that the Independent Eastern Torpedo Company was a foreign corporation authorized to do business in Oklahoma; that Jim Kamp was an employee of said corporation; that plaintiff was employed by W. P. Smith as a tool dresser on an oil and gas well located in said county, and that by virtue of his employment it was his duty to immediately resume work after the defendants had discharged a shot of 60 liquid quarts of nitroglycerin; that on September 2, 1948, Jim Kamp, the expert shooter of the Torpedo Company, prepared the well for shooting, which shot was set to go off at 11:02 a. m., September 3,

1948; that thereafter, at the time appointed, Kamp announced that said shot had been discharged; that plaintiff relied upon such announcement and resumed work and was near the opening of the well when the charge of nitroglycerin exploded and that as a result the plaintiff sustained serious permanent injuries to his face and eyes and that the injuries were caused by the direct and proximate result of the negligence of defendants; that the shooting or blasting of an oil well with a heavy charge of nitroglycerin is known to be an inherently and extremely dangerous operation requiring the highest degree of care on the part of those who undertake such a dangerous performance; that such facts were, at all times, well known and understood by the defendants; that the defendants agreed to shoot the well in the usual and customary manner as aforesaid; that in doing so they held themselves out to plaintiff and other persons interested or likely to be affected by such operation as being fully competent, capable and experienced in shooting oil wells with the amount of explosives as herein described; that defendants held themselves out as able to, and agreed that they would, perform the work of shooting the well without danger or injury to the plaintiff, or any other person who, at the time, was rightfully on the premises during the discharge of their expert services in shooting the well. That as experts it was defendants' duty to know and understand all of the dangers and hazards attached to the use of such explosives; that it was their duty to carefully watch and actually determine accurately when the charge of dangerous explosives had been fully discharged and when the same had spent its force and effect in the natural process of explosion; that in addition thereto, it was their duty to use the highest degree of care and caution to determine when said shot had been discharged and thereafter to advise plaintiff and others who might be rightfully on the premises that such explosives had been

set, that said shot had been discharged, and when it was safe for plaintiff and others to resume work on the well; that notwithstanding that it was the duty of defendants to so advise and warn plaintiff, they failed and neglected to do so and were thereby guilty of negligence resulting in plaintiff's injury; that while the defendants knew, or by the exercise of ordinary care should have known, that the charge of nitroglycerin had not in fact exploded at the time set by the defendants for its discharge; that defendant Jim Kamp, acting for and on behalf of himself and his employer, stated to plaintiff and others, in substance, that the charge of nitroglycerin had in fact discharged and exploded and that such charge had fully spent its force; that such statements and acts on the part of the defendants were so made and done, knowing full well that these statements (and conduct) would be and were in fact relied on by plaintiff and that he would resume work on the drilling floor near the oil well immediately after the announcement.

It was further alleged that immediately after having announced that the charge of nitroglycerin had been discharged, or exploded, that defendant, Jim Kamp, proceeded to make an inspection of the well by looking into and around the well; that by means of such inspection so made, the defendant knew, or by the exercise of ordinary care and caution, under the circumstances, could have known and should have known, that said charge had not in fact exploded, but that, notwithstanding this, he again announced to plaintiff, and others rightfully on the premises, that the shot of nitroglycerin had exploded; that said charge had been fully exhausted and that the shooting of the well was completed; that this conduct and these statements were made, knowing that it was the duty of plaintiff to rely thereon, and that he would resume work in dangerous proximity to the well; that plaintiff did so rely on the statements, acts, and conduct of the defendants and by

reason thereof believed that the charge had exploded as represented; that in the exercise of due care, and in reliance upon such statements and conduct, he resumed his work near the hole or opening of the well, and was picking up and removing small tools and equipment therefrom when the charge of nitroglycerin placed in the well by defendants actually, and in fact, exploded; that as a result of said explosion there was forced out of the hole a great volume of water, sand, gravel, dirt and oil with a violent and terrific force; which struck plaintiff on the head and in the face and eyes and a large portion of his body with such great force that it knocked him unconscious, threw him a considerable distance and resulted in serious and permanent injury to him; that his injuries were directly and proximately caused by the negligence and want of care by defendants; that by reason thereof he is permanently disfigured about the face and head and eyes; that he is permanently and totally industrially blind; that he has suffered and will suffer great and excruciating pain the rest of his life; that he is permanently and totally disabled from working or following any gainful occupation.

It is further alleged that at the time he sustained the injuries complained of he was a strong, robust and able-bodied man, in good health and working steadily and continuously as a tool dresser and oilfield worker, and earning $500 per month ($6,000 per year); that he had a life expectancy of 33 years and that he would have continued to earn this amount during the remainder of his life expectancy, except for the negligence of defendants; that through defendants' negligence he has been damaged in the amount of $140,-467 by loss of earning capacity; that he has suffered damages of $25,000 for pain and mental anguish, or a total sum of $165,467, for which he prays judgment.

Defendants answered denying generally all allegations not specifically ad-

mitted, and admitted its corporate existence, and that it placed and exploded a charge of nitroglycerin in the well in question.

Answering further defendants stated that if plaintiff sustained any injuries, as alleged in the petition which they do not admit, then, and in that event, defendants allege that the injuries, if any, sustained by plaintiff were the direct result and proximate result of negligence and carelessness on his part, and without which no such injuries would have been sustained by the plaintiff.

Plaintiff for his reply to the answer of the defendants, other than the general denial, denies that he was guilty of contributory negligence and alleges that he was wholly without fault, and renewed the prayer for judgment in his petition.

The essential facts, as disclosed by the record, are that prior to September 1, 1948, J. F. Smith, who owned the lease, or an interest therein, drilled an oil and gas well near Shawnee, Oklahoma. Finding no oil or gas in substantial quantity the well was plugged back from a depth of 5,607 feet to a depth of proximately 4,900 feet. This well was what is known as a "tight hole", that is, there were no caves or cavities in the earth at the bottom of the hole. The owner, J. F. Smith, then engaged the defendant Independent-Eastern Torpedo Company to shoot the well with 60 quarts of liquid nitroglycerin. On the 2nd day of September, 1948, the defendant Company sent defendant Jim Kamp, who was one of its expert shooters, to the well, and there, at the request of the owner, placed' on the bottom of this hole three containers containing 60 liquid quarts of nitroglycerin. The shooter used a time bomb which was set to explode and discharge the nitroglycerin shot at 11:02 a. m. on September 3, 1948.

Preparatory to placing the time bomb and shooting the well, the hole was plugged with a concrete fill of about 700 feet. The casing at the bottom was encased in concrete from 5,607 feet up to about 4,900 feet depth, and 7 inch O.D. Casing was then set in the hole, resting on this concrete. It was at the bottom of this hole and inside the concrete reinforced casing that the shooter placed the 60 quarts of explosives, the zero hour time bomb, and the umbrella bridge which was to protect the shot from sand and water used to "tamp" or fill the hole to within two feet of the top of the casing, which extended above the derrick floor. After the bomb was set, and all other preliminaries performed, the W. P. Smith Drilling Company, for whom plaintiff worked as tool dresser, who had been engaged by J. F. Smith to work on the hole with cable tools, filled the hole, when plaintiff was not present, by using two yards of sand and then finished filling with water. A hose was connected so that a constant stream of water ran into the hole and kept the casing filled to within two feet of the top of the casing where there was a hole in the casing which allowed the water to run out if it got above this point. This was for the purpose of keeping the well full of water. Further work on the well was discontinued until the shooting of the well.

Sometime before 11:02 a.m., on September 3, 1948, Jim Kamp, the expert shooter, who represented Independent Eastern Torpedo Company, returned to the well for the purpose of determining when the shot discharged. He had a seismograph, sometimes referred to as a G-phone or shot detector, which included earphones, watch, ammeter and diaphragm. The diaphragm of the instrument was buried about three inches in the ground near the well. When so arranged and when the earth vibrates, the hands of this instrument are supposed to move and the phone reveals a noise or sound. The shooter, while using this instrument, listened and watched the instrument and at 11:02 a. m., September 3, 1948, when the shot was set to go off, announced that the shot had discharged. After

making the announcement, the shooter walked toward the well where he met Walter Morris, superintendent for the J. F. Smith Company, who said "Yes, it went off right on the minute". They conferred and the shooter said, "I wonder if the water went down in the hole?" The shooter and Morris then went on the derrick floor and looked into the hole. Mr. Little, a farmer also looked into the well. Morris and the shooter said the water appeared to have gone down 15 or 20 feet. Mr. Little said the water was about 2 feet below the top of the casing. The shooter and Morris then walked off the derrick floor to a distance of about 15 or 20 feet from the well hole where they conferred with Mr. Louvier, the driller for W. P. Smith & Company, under whose supervision plaintiff worked. Morris and Louvier both said the shot was off because they felt the jar. Thereupon, Louvier, the driller, apparently believing the shot was off, resumed operations by attempting to start the motors which had been down for 24 hours. Plaintiff had been in a utility building, known as the "dog house" during this time watching the shooter. Plaintiff did not leave the dog house until the shooter had said and indicated that the shot had gone off and the shooter and Morris had gone up and looked into the well. After these assurances, and Louvier, the driller, had resumed work, the plaintiff left his place of safety. He followed Louvier, which appears to have been his duty and helped start the motors. (Morris and Louvier both testified that it was his duty to follow this driller and help him in this work without being ordered to do so.) After the motors had been started to resume work, plaintiff walked across the derrick floor. He stopped to pick up some small tools, at which time water and sand came out of the hole (well) with a terrific explosive force and went 75 to 100 feet high above the mouth of the well. This force hit plaintiff in the face, and on the head and body, inflicting upon him the alleged permanent bodily injuries.

The theory of the plaintiff is that the defendants negligently failed to use the safe and best known means of determining when a charge of nitroglycerin was discharged, and that by doing so, they, through the expert shooter, Jim Kamp, negligently and erroneously announced that the 60 liquid quarts charge of nitroglycerin had exploded and discharged when, in fact, it had not, and that due to this negligence and erroneous announcement, and conduct of the shooter, plaintiff was led to believe and did believe and rely upon the announcement and conduct of the expert shooter and was thereby injured; that this negligent and erroneous announcement and conduct was the proximate cause of plaintiff's injury and damages sustained thereby.

The cause was tried to a jury upon this theory resulting in a verdict of the jury in favor of plaintiff, which verdict was approved by the trial court and judgment rendered accordingly, resulting in this appeal.

The defendants present their numerous assignments of error under six propositions. Their first proposition is:

"There was no proof of any negligence on the part of the plaintiffs in error, or either of them, and the trial court erred in overruling the demurrer to the evidence of the defendant in error, and likewise erred in overruling the request of the plaintiffs in error for a directed verdict at the conclusion of all the testimony, to which plaintiffs in error excepted."

In passing on alleged error in overruling defendants' demurrer to plaintiff's evidence, and their request for a directed verdict, the evidence will be construed in the light most favorable to plaintiff and where there is any evidence or reasonable inferences from the circumstances reasonably tending

to establish a cause of action, or to sustain a jury's verdict and the court's judgment based thereon, such judgment will be sustained on appeal unless shown to be contrary to law.

Defendants, under this proposition, assert that it was the position of plaintiff that the shooter said the shot was off when, in fact, it was not, and they argue that the proof showed that the shot exploded as announced by the shooter, and that any damage to plaintiff was due to his contributory negligence in knowingly going upon the premises when he knew from experience that he might be injured from a delayed eruption after the explosion such as, they claim, occurred in this instance. They further contend that the shooter used due care and diligence in the use of standard instrumentalities for determining whether the shot was, in fact, off, and that of this fact there is no dispute, and that since this is true, even if the shooter had announced to the superintendent that the shot was off when in fact it was not, neither of the defendants would have been guilty of actionable negligence because to hold them liable for damages to persons (and property) when the shooting company, through its agent, places and explodes a charge of nitroglycerin in the well, or attempts to do so, would result in making the company an insurer against risk of damage to the well or to any of the employees about the premises, which, they assert, is not the rule. They assert that the measure of duty is that the shooting company must use standard equipment and such care and diligence as an ordinarily prudent person would exercise under the same or similar circumstances, and having done so the shooting company, its agents, servants and employees, are exempt from any claim for damages which may result from the explosion of a charge of nitroglycerin or any attempt to explode.

The evidence shows that while the shooter used a shot detector in an effort to determine when the charge of nitroglycerin had exploded, there was ample evidence from experienced persons to the effect that a more practical and positive means of determining when a shot, such as this one, had exploded, was available and well known to this shooter. Witness Hashburger, a shooter of 31 years experience, testified in effect that the only certain way to determine when a shot had exploded, tamped as this one was, was to watch and observe the top of the hole; that when the shot actually exploded there would always be a demonstration at the top of the hole. He testified:

"Q. Have you ever shot in casing with a shot tamped with sand and water to the top of the hole? A. Yes sir.

"Q. Do you have an opinion as to what will happen at the top of the hole when that shot goes off? A. My opinion is that the water would come out the top of the hole when the shot goes off.

"Q. Now, I will ask you whether or not, in your opinion, there is a positive test to tell when that shot goes off? A. Yes, sir.

"Q. What is that test? A. You watch the top of your hole; something's going to come out there when that shot goes off."

Even the shooter testified that there was another way, aside from the shot detector, to determine when the shot had exploded. He said that this was "simply by watching". The shooter further stated:

"A. Simply by watching. If the hole is filled with fluid, by watching the top of the control head to see if any fluid comes up or boils up, or if there is any movement on top of the fluid; even a wave on top of the fluid indicates that the shot is off. You don't always pick it up with the shot detector. If the hole is not leaded with fluid, you can stuff papers in the top of the control head or put a piece of paper on top of the control head to see if it blows it out or if it falls off or if there is any reaction from the gas or pressure formed."

J. P. King testified:

"A. Well, when the shot goes off in the hole, loaded under those conditions inside the pipe and all, it would naturally, kick some of the water out the top of the hole.

"Q. In your opinion, how high would that water jump? A. Well, it would vary some. Sometimes it would blow it . . . well, it would depend upon the size of the shot and the power it had. I have seen it blow it 50 to 150 feet, and I have seen it blow it as high as 150 feet above the derrick.

"Q. Is this movement of the water instantaneous with the explosion? A. It is. Well, at the time the shot goes off, it would have to kick out at the same time that it went off, 'cause it would be the line of least resistance, coming up the hole, enclosed by your casing; and, the formations would be hard and solid and it would naturally follow the line of least resistance, and that would be out the top of the hole.

"Q. Do you know whether or not this is a customary test to determine when a shot goes off in that type of an oil well? A. Yes.

"Q. Is that the most reliable means of determining when a shot goes off in a well that is loaded as this well is loaded and that has the same conditions as this well? A. In my experiences of the shot going off in a hole that's loaded as this hole was, the most definite way of telling when the shot goes off is when that water kicks out of the hole.

"Q. Have you observed these g-phones being used? A. Yes, sir, I have.

"Q. Have you ever experienced a jar, other than from the well, registering on those g-phones? A. Yes, sir, I know of occasions where they would get a jar on a g-phone when the shot hadn't gone off.

"Q. What type of a jar will disturb those g-phones? A. I seen a bird dog jump out of a car and cause the shooter to think the shot had gone off on his g-phone.

"Q. What other types? A. Oh, stomping on the ground or anybody moving on the ground, any kind of a jar on the ground.

"Q. Have you definitely experienced a well being miscalled by g-phone? A. Yes, sir.

"Q. In addition to those facts, assume that a time bomb was set to go off at 11:02 in the morning and that at the time, 11:02, the shooter said that the shot had gone off; and that at the time nothing came from the top of the hole; but, from five to ten minutes later, a sudden eruption from the top of the hole; when, in your opinion did the shot go off? A. At the instantaneous time that the shot goes off, this eruption will happen at the top of the hole there.

"Q. Mr. King, in your opinion, is it safe to go around an oil well after it has been shot? A. Yes, sir.

"Q. You say you have had a lot of experience in connection with the shooting of wells. Now, after the shot goes off, what do you do? A. Well, after the shot goes off, we usually get ready to run our tools, which ever they may be; and, we have to start up the motors, always for they are down so there won't be any vibrations; and what tools are on the floor, we gather them up; and then we wait on orders to go into the hole with whatever tools we are going to run.

"Q. Is this immediately after the shot goes off? A. Just as soon as the shot goes off, why that's what we start doing there.

"Q. Mr. King, what percentage of shots would you say would make a demonstration at the top of a 5,000 foot hole? A. Any, shot, shot within the pipe.

"Q. Any shot, shot within the pipe? A. In my experience, they all kick out when shot within the pipe; they all kick out the top of the hole."

This testimony, together with other evidence in the record, though in conflict with defendants' evidence on this issue, clearly shows that the jury was justified in finding the defendants negligent in not having used this practical, positive, and certain means to deter-

mine when the shot had discharged. Where there is a practical and apparently certain means to determine a result, especially when dealing with a dangerous substance, and it is not used, and injury results from such conduct, the person responsible for such failure is liable. Certainly the person in charge of the instrumentality who makes a false determination about the explosion of a shot, when relied upon by a person who is rightfully present, and is injured by reason of the failure to use such means, is entitled to recover because the shooter did not use that degree of care commensurate with the danger at hand. See Title 25 Okla. St. Ann. §§3,4,5, and 6, and annotations.

The responsibility of a person using a dangerous instrumentality such as nitroglycerin places on him the duty to exercise the degree of care commensurate with the danger at hand, including the employment of known means to prevent injury to others. This rule is set forth in the case of Lusk v. Phelps, 71 Okla. 150, 175 P. 756, where this court said:

"It was the duty of defendants when using dynamite in the prosecution of their business to exercise such reasonable supervision over the management and use thereof as would result in the observance of the utmost care on the part of defendant's employees using such instrumentality for the safety of others, and having intrusted such dangerous agency and instrumentality to their servants they cannot shift this responsibility with reference to the custody and use thereof to the servants, and thus escape liability for no one has a right to put in operation forces calculated to endanger human life and property without placing them under the control of a competent and ever active superintending intelligence, and whether he undertakes the use himself, or delegates the use thereof to another, the obligation abides with him to use a degree of care commensurate with the dangerous character of the agency or instrumentality, and a failure to discharge this duty in either case imposes the corresponding liability of making reparation for any injury that may ensue as a result thereof."

As has been indicated in the authority cited above, a higher degree of care is required of a person using an agency known to be dangerous. And an oil well shooter, in using a dangerous substance such as nitroglycerin, is required to exercise that degree of care and caution which is commensurate with the danger involved. This general rule is clearly set forth in the case of American Glycerin Co. v. Eason Oil Co., 98 F. 2d 479, and later approved in Worcester v. Pure Torpedo Co., 127 F. 2d 945. To the same effect is the statement in 35 C.J.S., Explosives, Sec. 7.

To what has been said above, it may be added what this and other courts have said in similar situations. In the case of Martin v. McLain, 184 Okla. 418, 87 P. 2d 1075, in the body of the opinion, at page 420 Okla. Reports, p. 1077, Pac. we held:

"However, in a case like the present, where the only yardstick which the law furnishes for measuring the duty of the defendant is the care which a reasonable and prudent person would exercise under the circumstances and there may be a difference of opinion as to what conduct would constitute such care, it is not only the function of the jury to determine the facts as to what the defendant actually did, but it is also their exclusive prerogative to determine whether or not that conduct constitutes negligence within the legal definition thereof that is set forth in the court's instructions. As we held in Prickett v. Sulzberger & Sons Co., supra, quoting the rule laid down in Interstate Compress Co. v. Arthur, supra, 'It is only in cases where the facts are such that all reasonable men must draw the same conclusions from them that the question of negligence (or the want of negligence) becomes one of law for the court, and then only when no recovery can be had upon any view which can properly be taken of the facts which the evidence tends to establish' (57 Okla. 567, 157 P. 365). In the cited case, it was also said: 'Negligence is so much a mixed question

642

of law and fact . . . that courts are seldom justified in saying that all reasonable men will agree with them on the question of whether a given state of facts constitutes the exercise of ordinary care.' "

In the case of White's Administrator v. Kentucky Public Elevator Co., 186 Ky. 91, 216 S. W. 837, at page 839, it is held:

"*The only basis for the claim that defendant exercised ordinary care in ordering deceased to clean the tank with the assurance it was about empty was the test made with the sounding bucket, but clearly this test was inaccurate, as testified by Mr. Weiser, and wholly undependable, or it was carelessly applied by Mr. Kelty, because the tank was not nearly empty, as he might easily have ascertained by comparing the weights or asking Mr. Whitney. It was his duty to have known the grain was still being withdrawn from the tank, and, knowing this, to have exercised reasonable care to ascertain it was so nearly empty as not to be dangerous before ordering it cleaned; and deceased, who was under no duty of inspection, had the right to assume he had done so, and that the place was reasonably safe.* Olive Hill Fire Brick Co. v. Stone, 153 Ky. 360, 155 S. W. 733; Louisa Coal Co. v. Hammond's Adm'x, 160 Ky. 260, 169 S. W. 709; Interstate Coal Co. v. Garrard, 163 Ky. 235, 173 S. W. 767. (Emphasis ours.)

Then in Rankel v. Buckstaff-Edwards Co., 138 Wis. 442, 120 N.W. 269, at page 270, the court states:

"Preparatory to the blasting of the frozen earth, the workmen engaged in breaking up the ground drove an iron bar into the ground with a sledge hammer. When the iron had been driven into the ground to the desired depth, the bar was withdrawn, and the workmen retired and took no part in the blasting operation. Spanbauer was the only man at work on the grounds of the defendant who had had any experience with dynamite, and when the hole had been made he charged it by placing the dynamite in the hole, placing the exploding cap on it, making the necessary electrical connections, filling the hole with earth, and tamping it down, and

he then exploded the charge. Several charges of dynamite were exploded at the same time by having a series of charged holes connected with the one electrical instrument used to discharge the exploding caps. Four charged holes were connected for the last blast made by Spanbauer. About one of the holes of the earth was not thrown up as about the other three, and Spanbauer then again connected the wires from this hole with his electrical apparatus and ran a current through the wires. No explosion followed, and Spanbauer made an examination of the ground in the vicinity of the hole and saw a crack about 1½ feet from the hole. He attributed the crack to the supposed explosion of the charge in the hole, and told the men to proceed with the digging, that everything was all right. Subsequently plaintiff, while working in this vicinity struck the unexploded charge of dynamite with a pick, and by the ensuing explosion lost the sight of both his eyes and suffered other injuries. * * *

"*Neither the plaintiff nor the other workmen took part in setting and packing in the charges or in connecting them by fire with the battery or in discharging them. All of this was under the control of and was performed by Spanbauer in the capacity of blaster. From this it appears that the setting and exploding of the blast was exclusively intrusted to the expert, and that plaintiff took no part in performing this service. It is obvious from the dangerous character of this service that it was treated as separate and distinct from the service plaintiff and the other workmen were performing in excavating the earth for the foundation of the mill.*" (Emphasis ours.)

This same general rule was applied in the case of Valz v. Goodykoontz, 112 Va. 853, 72 S. E. 730. There it was held:

"*Where a contractor who is blasting an obstruction off a railroad track, placed thereon in the prosecution of his own work, has set a number of blasts, an assurance to an employee of the railroad company, present to see that the obstruction is quickly removed, that there is no danger, before all the blasts have exploded, is negligence and amounts to a failure to exercise the ordinary care which such person is en-*

*titled to have exercised for his safety."* (Emphasis ours.)

In the body of this opinion, the court says:

"Thereupon along with Valz's men and a section foreman and his gang, they retired to a place of safety, where they remained until after four blasts had exploded, when Harvey called out: 'All over boys; come on back' and set out with his men to resume work. The plaintiff in company with the freight conductor and a civil engineer, followed Harvey, and, addressing him by name, inquired at what time they could clear the track. About that time the plaintiff also directed Harvey's attention to smoke arising from behind a nearby rock, and said: 'Mr. Harvey, what is that smoking?' to which remark Harvey replied that it was 'nothing'— 'just some powder or a chunk burning up;' that there was 'no danger.' The plaintiff repeated the inquiry about the smoke, and asked if it was perfectly safe, and was assured by Harvey that it was safe, and that there was no danger. Thus assured, he continued to follow Harvey, who had passed the danger point, when a delayed blast, from which the smoke was issuing, went off, and a fragment of rock struck the plaintiff on the side of the head, crushing in the skull and leaving a hole large enough to admit the passage of a large duck egg or goose egg, and inflicting upon him injuries of a serious and permanent character.

"We are of the opinion that the foregoing facts and just inferences which a jury would have been warranted in drawing from the evidence make out a clear case for the recovery of damages."

The Supreme Court of Kansas, in the case of Taylor v. Atchison Gravel, Sand & Rock Co., 90 Kan. 452, 135 P. 576, announced and applied this rule. There it was said:

"Evidence tending to show the following facts is held to authorize a recovery: in the operation of a quarry a small charge of powder was exploded in a drilled hole, for the purpose of enlarging it so that it would receive a larger quantity. The custom was, in such circumstances, for the superintendent to test the hole to be sure that no fire remained in it before it was loaded for blasting. The plaintiff was directed by the superintendent to load this hole, and was told that it was safe. He knew the custom, and believed the test had been made. Relying on this belief he attempted to load the hole. The powder exploded, and he received the injuries, on account of which he sued."

It was held in the case of Lynchburg Traction & Light Co. v. Gordon, 123 Va. 198, 96 S. E. 195, at page 196:

"It was his duty to decide whether the current should be cut off, and therefore primarily his duty to know whether it was on or off at a given time and place. In this respect he was a vice principal, and the plaintiff had the right to rely upon his statement that the current was off. This being true, the question discussed to some extent before us as to whether rubber gloves or other instrumentalities for use in cutting live wires were available to the plaintiff and should have been used by him is immaterial. The wire would have been harmless, and the plaintiff could with perfect safety have done exactly what he did do, if the foreman's alleged statements had been true."

Therefore, the argument that the plaintiff had no right to rely upon the words of assurance given by the shooter, that the shot had discharged, or the conduct of the shooter and Morris, the superintendent, which included going and looking into the hole after the shooter had negligently and erroneously, as found by the jury, announced the shot off before the explosive eruption which injured the plaintiff, is untenable. The conduct of the shooter and the superintendent in doing so was a most dangerous act, but it assured the plaintiff that the shot had discharged. It assured him that he was safe in returning to work.

The argument that the plaintiff had been present on many occasions when wells had been "shot" and knew the danger and relied on his own judgment and not that of the shooter is, under the circumstances herein, immaterial

and unavailable as a defense. The evidence disclosed that the well would have been harmless and plaintiff could, with perfect safety, have done exactly what he did do, in performing his duty, if the shot had been discharged at the time defendant's words and conduct indicated and as plaintiff evidently believed. Plaintiff took no part in the "setting off" of the charge of the 60 quarts of nitroglycerin in the well. This was intrusted to the expert shooter, Kamp. Because of the dangerous character of this service it was treated as separate and distinct from the service plaintiff was performing. The shooter, who knew the dangerous character of this service which was treated as separate and distinct from the service plaintiff was performing, and who knew the dangerous character of the nitroglycerin, alone was responsible for the proper detection of the "discharge" of the explosives so that persons rightfully there would not be injured in the performance of their duties.

The shooter, as an expert, had undertaken the duty to explode or discharge the heavy charge of nitroglycerin in the tamped casing, at the bottom of the oil well, and he was bound to perform that duty in such a manner that those who were rightfully led to a course of conduct or action on the faith that the duty would be duly and properly performed should not suffer loss or injury by reason of negligent failure to perform it, and the nature and extent of the duty assumed by him are factual matters to be established by proof of his actual conduct. 65 C. J. S., Negligence, Sec. 4.

The plaintiff has, without question, shown that by the act of the improper detection of or the failure to detect and announce when the discharge of the explosives occurred, his injuries, though unintentional, were within the range of reasonable apprehension and under circumstances from which varying inferences might have been possible and was a question for the jury. Palsgraf v. Long Island Ry. Co., 248 N. Y. 339, 162 N. E. 99, 59 A.L.R. 1253. Therein it was said:

"If the harm was not wilful, he must show that the act as to him had possibilities of danger so many and apparent as to entitle him to be protected against the doing of it though the harm was unintended."

The plaintiff had a clear right to rely upon both the words and conduct of the shooter that the dangerous explosives had discharged. Since this information was erroneous and plaintiff relied on it to his injury, the defendants are liable. The right to recover was not dependent upon the existence of any privity of contract or legal relationship of any kind between the plaintiff and defendants. The applicable rule is stated in 65 C.J.S., Negligence, §4, and 38 Am. Jur., Negligence, §§21 and 22. See, also, Title 76 Okla. St. Ann., Torts, §§1 and 5.

This court, however, has already determined that a privity of contract or legal relationship was not essential to recovery in this character of action. In Lisle v. Anderson, 61 Okla. 68, 159 P. 278, we held:

"Whenever the circumstances attending a situation are such that an ordinarily prudent person could reasonably apprehend that, as the natural and probable consequences of his act, another person, rightfully there, will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises; and, if such care is not exercised by the party on whom the duty rests and injury to another person results therefrom, liability on the part of the negligent party to the person injured will generally exist, in the absence of any other controlling element or fact, and this, too, without regard to the legal relationship of the parties."

We very definitely stated this rule in the case of Southland Cotton Oil Co. v. Renshaw, 148 Okla. 107, 299 P. 425, where, in the Syllabus, it is held:

"While a volunteer, or a substitute, assisting or doing the work of a regular

employee in a cotton oil mill may not recover on the basis of service, he is entitled to the exercise of that degree of care owing to persons rightfully upon the employer's premises and may base a recovery on general principles of negligence, and notwithstanding the volunteer or substitute places himself in a position of danger, even negligently, the employer is liable if the injury could have been avoided by the exercise of ordinary care on his part or that of the employee."

In the case of Bright v. Barnett & Record Co., 88 Wis. 299, 60 N. W. 418, in holding that privity of contract was not essential to recovery, there, in the body of the opinion, it was said that the duty rests on the principle that the law reposes the duty on anyone to avoid acts in their nature dangerous to the lives of others.

In 65 C. J. S., Negligence, §65, p. 556, the rule is stated to be:

"The duty to exercise care to avoid injury is not restricted to those in contractual relationship with the alleged wrongdoer, but extends to others lawfully present, and employed, as for example, to the servant of another who is where he has a lawful right to be in the performance of his ordinary duties."

In the more recent opinion of Hughes v. Shanafelt, 203 Okla. 80, 218 P. 2d 350, we approved the rule in Lisle v. Anderson, supra, by stating:

"In that case the court pointed out the essential elements of actionable negligence. It was then determined that no relation of master and servant existed, but this court held, after discussion of numerous authorities, as follows: *'Thus it will be seen that the rule deducible from the authorities, supra, is that, whenever the circumstances attending the situation are such that an ordinarily prudent person could reasonably apprehend that, as the natural and probable consequences of his act, another person, rightfully there, will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises, and if such care is not exercised by the party on whom the duty rests and injury to another person results therefrom, liability on the part of the negligent party to the person injured will generally exist, in the absence of any other controlling element or fact, and this, too, without regard to the legal relationship of the parties.' "* (Emphasis ours.)

The defendants, however, largely predicate their defense on what it is claimed was held in the case of International Products Co. v. Erie R. Co., 244 N. Y. 331, 155 N. E. 662, and the case of Chicago, R. I. & P. Ry. Co. v. Smith, Adm'x, 160 Okla. 287, 16 P. 2d 226, and other cases of similar import. In the railroad case, supra, there was no mention of the theory of any contractual or legal relationship between the parties. The case is based on a total failure of the plaintiff to establish any fact of negligence. It was not shown that any employee of the company was, through want of care, responsible for the conductor's death. The law therein can have no bearing on the issue here presented. The holdings in the case of International Products Co., supra, does not relate to facts such as are presented here. However, the court in that case very definitely held that words, negligently spoken, when relied upon, may justify recovery where a person relying thereon has been injured. Therein, in the body of the opinion, the court said:

"Obviously, however, the rule we have adopted has its limits. Not every casual response, not every idle word, however damaging the result, gives rise to a cause of action. Chancellor Kent might not be held responsible for an error in one of his 'battery opinions.' As he himself said, they cost nothing, and bind no one. Liability in such cases arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it, that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising

out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information and the other giving the information owes a duty to give it with care."

It is evident that in this case the rule stated is one of general application. The relationship required to sustain recovery is that the plaintiff had a right to be present at the time and to rely upon the false words spoken or erroneous information given. It does not hold that there must be a privity of contract before the offending party may be held accountable. Its only requisite is that the parties must be in such relationship to each other that one is dependent upon the other to exercise due care and caution in what he is doing and saying; a failure to exercise such care, whether by being misled through spoken words or rash conduct, or otherwise, constitutes negligence. If the person is injured in relying upon the assurance given or the conduct performed, as in this case, he is entitled to recovery.

In support of this statement, it has generally been held, as in Lisle v. Anderson and Hughes v. Shanafelt, supra, that a privity of contract between the parties is not a prerequisite to the existence of a duty to exercise due care, and that a liability exists for negligent conduct resulting in injury to one rightfully present. The rules deducible from the authorities are stated in 119 A.L.R. 1002; 38 Am. Jur., Negligence, page 655 et seq. and cases cited therein, and may be stated as follows: First, this duty is not dependent upon the existence of a contract relation between the person who controls the dangerous instrumentality and one who is injured thereby, but rests upon the principle that it is the duty of every man to use his own property so as not to injure the person or property of others, 38 Am. Jur., Negligence, §23 et seq.; 60 N. W. 418, 26 L.R.A. 524. Second, liability in negligence is not necessarily dependent upon a pre-existing privity in legal relationship between the person injured and the person causing the injury. 123 A.L.R. 863; 38 Am. Jur., Negligence, §14 et seq. The duty of vigilance to prevent injury has its source in the laws applicable to human relations rather than in a narrow conception of privity. 34 P. 2d 481; L.R.A. 1916F, 696; 111 N. E. 1050.

We are of the opinion that the foregoing facts and reasonable inferences which a jury would have been warranted in drawing from the evidence make out a clear case for recovery of damages, and, that by reason thereof, the errors complained of under defendants' first proposition are untenable. And, in this connection, we note that defendants' fifth proposition is that:

"The defendant in error could predicate no cause of action against plaintiffs in error on the announcement made by the shooter, Jim Kamp, to the superintendent of the lease that the charge of nitroglycerin placed in the well exploded at the appointed time."

The argument under this proposition is largely a repetition of the matters presented under plaintiffs in error's first proposition. We think what has been said as to the first proposition disposes of the arguments presented under the fifth proposition, and we therefore deem it unnecessary to further discuss the merits of this issue.

Defendants' proposition No. II is that:

"The trial court erred in giving instructions requested by the plaintiffs in error numbered 2 and 3, to which plaintiffs in error duly excepted."

And proposition No. III is:

"The trial court erred in giving instructions numbered 3, 5 and 6, to which plaintiffs in error duly excepted."

Requested instruction No. II, refused by the court, advised the jury that if the shooter used due care and diligence in an effort to determine if the shot was discharged or exploded before he announced that it had, it would make no

difference whether it had gone off or not; that the announcement that it had gone off when such was not the fact would be immaterial. This is not the law, or standard of conduct, as we have shown heretofore under plaintiffs in error's first proposition.

Requested instruction No. III, which was refused by the court, embraced the theory that the work of shooting the well by the expert shooter was completed and turned over to the owner when plaintiff was injured. This constituted an affirmative defense which was neither pleaded nor proven.

An examination of the instructions as a whole indicates that the court submitted the issues to the jury most favorable to the defendants, and the instructions, when considered in their entirety, fairly presented the issues to the jury. There was no error in either the rejection of requested instructions under plaintiffs in error's second proposition, or in giving the instructions complained of under the third proposition.

It is next contended under plaintiffs in error's proposition IV that:

"The verdict of the jury is excessive and appears to have been rendered under influence of passion and prejudice."

To sustain this proposition they cite and rely upon the cases of St. Louis & S. F. Ry. Co. v. Hart, 45 Okla. 659, 146 P. 436; St. Louis-S. F. Ry. Co. v. Hodge, 53 Okla. 427, 157 P. 60; St. Louis, I. M. & S. Ry. Co. v. True, 71 Okla. 264, 176 P. 758 (Cert. denied 63 L. Ed. 801.)

These authorities or opinions were written several years ago, and this court will not consider them as a measure of damage in this time of the devaluated dollar, the higher individual earning capacity, and the modern tendency of allowing much larger verdicts to stand than were permitted a few years ago. John A. Brown Co. v. Clause, 205 Okla. 122, 235 P. 2d 680. In the second and third paragraphs of the syllabus of the John A. Brown case, supra, we said:

"The general rule is that unless there has been an abuse of discretion, the trial court's ruling on a motion for a new trial on the ground that the damages are excessive will not be disturbed.

"In an action for damages for personal injuries sustained, the court will not grant a new trial on the ground of excessive damages, unless the amount awarded clearly shows that the jury was actuated by passion, partiality, or prejudice."

There is no evidence in the record to indicate passion or prejudice toward defendants on the part of the jury, and we are unable to say that such existed by the amount of the verdict alone.

The evidence sustained the allegations of plaintiff's life expectancy, earning capacity and loss of earning capacity, pain and suffering and bodily disfigurement.

It is argued that the medical testimony is insufficient to ascertain that plaintiff was totally and permanently industrially incapacitated. This was established by Dr. G. W. Brown, who testified in detail as to his physical disabilities. Defendants did not question the medical testimony of the plaintiff. They did not ask to have plaintiff examined by other medicos, nor offer any testimony on this issue. An examination of the record convinces us that the verdict and judgment for plaintiff was not excessive.

The sixth and last proposition is that:

"The plaintiff in error, The Independent-Eastern Torpedo Company, was an independent contractor and its contract had been completed and its work accepted by the owner of the well prior to any injury sustained by the defendant in error by reason of the explosion of the said charge of nitroglycerin in the well in question, and no liability did or could attach to the plaintiffs in error, or either of them."

Under this proposition, it is urged that Morris, the superintendent, and

Kamp, the shooter, testified that the work of shooting the well had been completed, and the work accepted by the owner, and that defendants were not liable for damages for an accident that happened subsequent to the completion of the work. Citing Armstrong v. City of Tulsa, 102 Okla. 49, 226 P. 560, which they contend is the leading case on the subject of completion and acceptance.

This contention is without merit. It is necessary to plead defenses which assume or admit the original cause of action alleged, but which are based upon subsequent facts or transactions which go to qualify or defeat it, and defenses which are analogous to the ancient facts in abatement—in other words—new matter; and an entire failure to plead a defense is not cured by the introduction without objection of evidence in support of it, or by finding in relation thereto. Bancroft's Code Pleading, vol. 1, §267. This is the rule applied in Kurz v. Stafford, 135 Okla. 121, 274 P. 674, where, in the first syllabus, we said:

"Whenever a defendant intends to rest his defense upon any fact which is not included in the allegations necessary to the support of plaintiff's case, he must set it out. Any fact which avoids the action and which the plaintiff is not bound to prove in the first instance in support of it is new matter and must be specifically pleaded."

The following cases are to the same effect; Mercantile Insurance Co. v. Murray, 171 Okla. 597, 43 P. 2d 451; Atchison, T. & S. F. Ry. Co. v. Weaver, 173 Okla. 156, 47 P. 2d 104; Venmex Oil Co. v. Thomas, 189 Okla. 407, 117 P. 2d 540; Sanders v. Matthews, 157 Okla. 223, 12 P. 2d 873.

Judgment affirmed.

WELCH, DAVISON, O'NEAL, and BLACKBIRD, JJ., concur, HALLEY, C.J., and CORN, ARNOLD, and WILLIAMS, JJ., dissent.

HALLEY, C. J., (dissenting). Plaintiff sued defendants to recover damages for injuries sustained to his person as a result of being struck in the face by matter flowing from the top of an oil well following the shooting thereof with nitroglycerine.

The accident occurred September 3, 1948, at a well drilled on a lease owned by one J. F. Smith and located in Lincoln county. The well was being drilled by one Price Smith under contract with the owner. The plaintiff was an employee of said Price Smith and as such acted in the capacity of a tool dresser for one Fred Louvier, who was employed by said Price Smith as a driller. Defendant Torpedo Company, under contract with the owner, shot the well and defendant Kamp, acting as its agent and employee, performed the service. The well had been drilled to a depth of 5,607 feet and plugged back to the depth of 4,950 feet and casing split in preparation for the shot. In accordance with its contract with the owner, the Torpedo Company, on September 2, 1948, placed in the hole three containers of nitroglycerine, each containing 20 quarts, attached thereto a time bomb set to explode at 11:02 a. m. on September 3, 1948, and placed thereover what is termed an umbrella. Upon the completion thereof the drilling contractor put in the hole 2 or 3 cubic yards of sand and then filled the hole with water and inserted a water hose so as to maintain that volume of water until the shot was exploded. Present on the premises on the forenoon of September 3rd were said driller and plaintiff, who were on twelve hour tour, which did not end until 12 noon of that day; Kamp, one Walter W. Morris, lease superintendent and representative of said J. F. Smith, and two others, landowners in the vicinity who were interested in knowing the potential of the well. Kamp, who came by automobile, brought with him a seismographic instrument, known as a shot detector, which he installed by placing the diaphragm thereof in the ground beside the car which was parked about 75 feet south of the well. The instru-

ment was provided with an ammeter which reflected to the eye the force of an explosion and ear phones which reflected the sound thereof. Shortly before 11:02 a. m., Kamp, seated upon the running board of his car, placed the seismograph phones in his ears and held the ammeter in his hand in anticipation of the explosion. At the same time Morris and Louvier stood about 25 or 30 feet from the well with watches in hand in order to note the time of the explosion. Practically on the minute set Kamp waved his hand to Morris and cried "its off", or words to such effect, meaning that the shot had exploded. Morris, in response, made a similar cry in recognition of the truth of Kamp's statement. Thereupon Louvier went to start the power in order that the motors, which had been dead more than 24 hours, might warm up. After giving said signal Kamp assembled his seismograph, placed same in his car and came to where Morris was standing and they together went to the well to note whether the water which filled the well at time of the explosion had settled. After noting the fact that the water had settled they left the platform of the well and stood nearby, engaged in conversation with Louvier who had returned from starting the motors. They were standing with their backs to the well and while so standing and engaged there was a terrific noise of an eruption. On turning to look at the well they observed the plaintiff lying on his back upon the derrick floor with water and oil which covered his face and had filled his eyes and nose, all of which resulted in injury. Reflecting his conduct at the time of and immediately preceding his injury, plaintiff testified that he was in the lease utility building known as "doghouse" talking with one of said landowners at the time set for the explosion. That from the doorway thereof, he observed the signal given by Kamp to Morris, and though he did not distinctly hear the words that Kamp spoke he was satisfied that they meant that the shot had

exploded. That he saw Louvier going to start the motors and joined him in order to assist. That after the motors were started he concluded that the large motor was running rather fast and he went to the side thereof to idle it down. After doing so he started across the derrick floor en route to the doghouse when he noted some lease tools lying around and he concluded to pick them up and thus leave the place clean when going off tour at noon. Then he was in the act of stooping to pick up a tool near the mouth of the well when the eruption occurred.

The uncontroverted facts in this case show that Kamp, the shooter, gave the warning that the shot had exploded and from that moment on it was dangerous to be around the mouth of the well. This fact was known to the plaintiff and the shooter had the right to rely on the fact that employees on a drilling well were experienced enough to know that it was dangerous to get near the well under such circumstances. This plaintiff had seen a hundred wells shot and was cognizant of the danger. He had been around drilling oil wells since he was twelve or fourteen years of age. The law is well settled that where reasonable warning has been given, the person in charge of a dangerous instrumentality on seeing another approach a dangerous place may assume that the latter will not place himself in obvious peril. 65 C.J.S. Negligence, §67; Choquette v. Key System Transit Co., 118 Cal. App. 646, 5 P. 2d 921. In 38 Am. Jur. §89, this statement is made:

"Persons who own, operate, or maintain dangerous instrumentalities have a right to rely upon others who may be imperiled thereby to take the usual and customary measures to avoid injury. They may assume, in the absence of information to the contrary, that others are in possession of their faculties and will exercise them in the normal and usual manner."

This statement is supported by the following citations: Bresee v. Los Angeles Traction Co., 149 Cal. 131, 85 P.

152, 5 L.R.A. (N.S.) 1059; Herring v. Wilmington & R. R. Co., 32 N. C. 402, 51 Am. Dec. 395; Derringer v. Tatley, 34 N.D. 43, 157 N.W. 811, L.R.A. 1917F, 187; Deans v. Wilmington & W. R. Co., 107 N.C. 686, 12 S. E. 77, 22 Am. St. Rep. 902.

What more could reasonably be expected of the shooter in this case? He went on the premises at the request of the owner. He knew that it was a drilling well and that it was customary to have experienced workers on the well. He warned the workers. He knew that he did not have to personally tell all of them to stay away from the mouth of the well. The plaintiff was warned that the shot had exploded. The shooter had no reason to think that the plaintiff would get so close to the mouth of the well that he would be injured by the explosion. There was nothing in the shooter's conduct, or the warning given, to make the plaintiff think that there was no danger at the well's mouth. It is true the shooter glanced at the well immediately after he gave the warning that the explosion had taken place, but he immediately stationed himself a safe distance from the mouth of the well. Sec. 480, vol. 2 in the Restatement of the Law of Torts contains this statement:

"A plaintiff who, by the exercise of reasonable vigilance could have observed the danger created by the defendant's negligence in time to have avoided harm therefrom, may recover if, but only if, the defendant (a) knew of the plaintiff's situation, and (b) realized or had reason to realize that the plaintiff was inattentive and therefore unlikely to discover his peril in time to avoid the harm, and (c) thereafter is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff."

In this case there was no negligence on the shooter's part, but even if there were there was nothing to make him realize that the plaintiff was inattentive and therefore unlikely to discover his peril in time to avoid harm. What

person who was engaged in shooting oil wells would think that any one who was experienced enough to be a tool dresser would get so near to the mouth of the well containing such a shot of nitroglycerin as to be injured before the all-clear signal had been given? Further on in sec. 480, this statement is made:

"The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril."

In this case the shooter did everything that a man of ordinary prudence would do who was working with a high explosive. The shot had been placed 23 hours before and there was no danger to any one as long as they kept away from the mouth of the well. No worker around the well was justified in getting too near the well's mouth until he was told it was safe to do so. In this instance, the plaintiff knew the danger, but let his curiosity get the better of him or forgot what he was doing. There was nothing in his conduct to indicate to the shooter that he should be given additional warning.

There was no evidence to sustain plaintiff's contention that there was negligence in the detection of the time the shot went off. The best methods were used and no living person can say that the shot did not go off when the shooter said it did. Surely that explosion at the mouth of the well could not take place at the same time the shot went off at the bottom of the well. The oil and sand from the bottom of the well that struck the plaintiff took some time to get to the surface of the earth. The doctor who first examined the plaintiff testified:

"When I saw the man, both of his eyes were filled with sand and mud; you could see the mud and what looked

to be crude oil or black oil; and, his nose was completely packed with it; his mouth was full of it; his upper part of his throat was; there was a number of abrasions filled with sand and gravel up each cheek in front of his ears beginning at the chin; and under his upper lip a laceration was filled with mud and gravel and oil; and his hair was and even his throat was just packed with it."

These materials traveled 4,600 feet, at least, through water before hitting plaintiff.

But what difference would the time the shot went off make in this case? Plaintiff knew it was not safe to be at the mouth of the well after the signal was given. One hour was the shortest time after the shot was supposed to go off that the danger period was over. Here the explosion reached the surface from 15 to 30 minutes after the warning was given.

Much is made of a Professor Cloud's testimony, but his testimony boiled down is that he thought that water would flow out of the top of the hole when the shot went off. He did not say that the matter from the bottom of the hole went out of the mouth of the well immediately upon the discharge of the shot. The evidence showed that water settled to a lower level immediately after the shot went off.

Even though the defendants were liable in this case, the verdict is excessive. This man was not blind after he recovered from the injury. He drove an automobile. He would not do that unless he could see enough to drive to his own satisfaction. If his employer had set off this shot the most he would have received would have been $10,500. The plaintiff was engaged in a hazardous employment covered by the Workmen's Compensation Laws of the State of Oklahoma. To place a judgment against these defendants of $65,000, when the shooter performed his duty as any prudent person would have done, is unreasonable. It is placing a burden on one of the necessary operations in the production of oil that it is not able to bear. It makes one in the well shooting business an insurer of all who come near a well that is being shot by him. This court should not countenance such a rule of law.

Under the facts in this case there was no duty upon the shooter to warn the plaintiff more than he did, and there was no negligence shown on the part of the shooter.

I dissent.