# White's Administrator v. Kentucky Public Elevator Company.

(Decided November 28, 1919.)

## Appeal from Jefferson Circuit Court (Common Pleas Branch, Third Division).

1. Master and Servant—Safe Place to Work—Negligence—Question for Jury.—Decedent lost his life in attempting to sweep the bottom of a large storage tank which he had been ordered to do by his employer's superintendent, who, after test, assured him the tank was nearly empty. There was evidence tending to prove and from which it might have been reasonably inferred that the test was inaccurate or carelessly made and that the large quantity of grain in the tank caused decedent's death. Held, that upon this evidence the question of defendant's negligence in failing to furnish deceased a reasonably safe place to work was for the jury.

2. Master and Servant—Question for Jury.—Where the evidence showed that the tank into which deceased was ordered was dimly lighted and dusty the question as to whether the danger was apparent to deceased was also for the jury.

3. Master and Servant—Contributory Negligence—Evidence.—The fact that deceased removed a rope from about his body which had been tied there upon instructions of defendant's superintendent is not sufficient to show contributory negligence as a matter of law, and is a question of fact for the jury, where there was evidence that the rope was placed about his body solely for his safety in descending a defective ladder and that it was not customary or expedient to allow it to remain after reaching the bottom of the tank.

4.  Master and Servant—Submission to Jury.—It being proven that the defective ladder had nothing to do with decedent's death, the court did not err in refusing to submit this question to the jury.

5.  Master and Servant—Negligence—Evidence.—Evidence that it was customary to so remove the rope from about the body after reaching the bottom of the tank was competent to prove whether deceased was negligent in so doing.

6.  Master and Servant—Customs and Usages—Pleading.—The rule requiring a custom to be pleaded before it may be shown in evidence is not applicable where the purpose is to prove the ordinary method commonly employed in order to determine whether a thing has been negligently done.

H. N. LUKINS and WALLACE A. McKAY for appellant.

HUMPHREY, CRAWFORD, MIDDLETON & HUMPHREY, E. P. HUMPHREY, ROBERT MILLER and LOUIS SEELBACH for appellee.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

Pernie White, a colored boy nineteen years of age, had been employed by the Kentucky Public Elevator Company for about six months as a "sweeper" when in June, 1916, he lost his life while attempting to sweep out one of his employer's large grain tanks. This is an action by his personal representatives to recover damages for his death, alleged to have resulted from negligence of the employer in failing to furnish him a reasonably safe place in which to work. At the conclusion of his evidence a verdict was directed for the defendant and his petition dismissed, and this appeal challenges the court's order directing a verdict for the defendant.

The tank in which decedent lost his life, known as No. 1, was one of a series constructed of concrete, circular in form, twenty-one feet in diameter and eighty-five feet deep. The bottom was not flat, but slanted to one side from all other directions at an angle of about 45 degrees so as to form a hopper with an opening on one side through which the grain could be discharged when desired by the force of gravity. This opening was smaller than a man's body, and the only means by which one could enter or leave the tank was an iron strap ladder attached to the side, leading from the top to near the bottom. The ladder in this tank had become detached at a point near its center and was not considered entirely safe at the time of the accident, and electric lights which had been used at one time for lighting the tanks when being

cleaned were out of order. Decedent, before going into the tank, lighted a lantern and with an attached cord lowered it to the bottom of the tank. The only other persons present at the time were Mr. Kelty, the superintendent of defendant company, and Jack White, the father of deceased, who was also an employee of the company. Mr. Kelty did not testify upon the trial and the father of decedent describes what happened at the time as follows:

"Q. What did Mr. Kelty say? A. He took a bucket and run the bucket down in there, said 'It is about out. Sweep it out right away.' I tied the rope on the boy there, and he said 'Tie it on him good.' 'Hold him over those ladders.' I said 'Yes, sir.' I tied the rope on the boy, let the boy down, held him while he was going over the ladder, in case ladder might break I could hold his weight up. The boy went on down in the tank; after he got down in the tank he said to me 'Papa—' I heard him holler, but you could not see anything, dark as anything with the dust. Q. What made the dust? A. That there was bad grain in there. Of course, they had been running it all day I guess, throwing it out. Q. What do you mean by bad grain? A. It was rotten when it came in there. They pulled it at nights, dried it. It had been in there five or six months. It had been in there ever since cold weather. And he went on out, when the boy went, started down the tank he went on out and the boy said to me 'Papa—' and I said 'What is it?' He said 'It seems to me as if there is grain sticking back in here, you better get that ladder and let it down to me so I can get back in there.' He said as if he knowed it was some back in there; he said 'It seems' there was some. He didn't say he knowed. Q. Could you see from the top down to where he was? A. No, sir, I could not see, the dust was so thick that I could not see. Q. Was there more dust than usual in the tank at that time? A. Yes it was more dust than usual. Q. Could you see the glimmer of the light down there at that time or was it perfectly dark? A. After the lamp got down to the bottom I could not see anything. I could just hear him talking and he asked me for a ladder. Q. How far was the bottom of the ladder from the top of the bin, that he went down on? A. It might have been about eight or ten feet; probably twelve feet from where he slides off from the ladder to slide down to this hole. The ladder

didn't go plumb down, the ladder that he had been going down on; it didn't go out of the hole. It stopped about twelve feet on the inside of the tank."

After reaching the bottom of the tank deceased untied and removed the rope from about his body. When the father returned with the ladder the son had asked for the boy did not answer, and going down on the ladder attached to the tank the father saw the lantern still burning and a quantity of grain in the hopper of the tank, but the boy was not in sight. This witness did not attempt to estimate the quantity of grain in the tank except by saying that it took about an hour for it to run out of the spout over the boy's body.

William Whitney, who had charge of the spout or opening at the bottom of the tank, testified that the grain had been running from this tank in a small stream all day on to a belt conveyor; that hearing young White had disappeared he opened the spout as wide as could be and the boy's foot came out but his body would not pass through; that the grain ran over the boy's body for ten, twenty or thirty minutes, he did not know how long; that he could not tell what quantity of grain came out thereafter, "but it might have been half a carload;" that he had not reported to anyone that the tank was empty, and that the grain was still running out in a small stream, as it had been all day, when he was asked about Pernie and went to the spout and opened it; that the corn in this tank was moist and in bad condition when it came in, but that it was put through a drier and was in pretty fair condition when it was put in the tank; that as it was being taken out of the tank the corn was not in good condition and was dusty.

John Cole, who had been employed by the defendant for fifteen years and frequently swept out the tanks, testified that the grain being taken out of tank No. 1 on the day Pernie lost his life was not in good condition. "It was some called it rotten grain, some say it was not bad, but it was not very good grain."

Jesse L. Weiser, a millwright by trade, who had had about fifteen years' experience with elevators, in handling and storing grain in tanks and emptying tanks, stated that there are several means in use of determining how much grain is in a tank, the best and only accurate one by comparing the weights of the grain put in and taken

out. Another way not so accurate is by sounding with a metal bucket or basket with a line marked in feet attached which will give the number of feet from the top of the tank to the grain, and knowing the number of bushels to the foot the quantity of grain in the tank may be easily calculated. This latter method was the one used by Mr. Kelty, the superintendent, before directing decedent to sweep out this tank, and from which, on the evidence, he must have concluded the tank was about empty and ordered it cleaned by decedent.

Mr. Weiser testified that when grain is allowed to remain in such a tank as this for any considerable length of time, even if in good condition when stored, it is liable to, and frequently does, adhere in large cakes along the slanting sides of the hopper, and other witnesses testified that it is sometimes necessary to chop up such cakes before the grain will run out of the hopper.

The court held this evidence insufficient to show negligence upon the part of the defendant, and this ruling of the court can be sustained only if it can be said that there was no room for honest difference of opinion as to the effect of the facts or reasonable inferences to be drawn therefrom. Morris v. L. & N. R. Co., 22 Ky. L. R. 1596; Lamberg v. Central Consumers Co., 184 Ky. 284.

That the tank was not empty or nearly so as defendant's vice principal assured decedent, nor reasonably a safe place in which to work, is obvious, so the questions raised by the evidence were whether Mr. Kelty exercised reasonable care in ordering the tank cleaned when it was not safe to do so; whether the danger was so obvious decedent assumed the risk; whether he was guilty of contributory neglect; and what was the proximate cause of the accident.

The only basis for the claim that defendant exercised ordinary care in ordering deceased to clean the tank with the assurance it was about empty, was the test made with the sounding bucket, but clearly this test was inaccurate, as testified by Mr. Weiser, and wholly undependable, or it was carelessly applied by Mr. Kelty because the tank was not nearly empty, as he might easily have ascertained by comparing the weights or asking Mr. Whitney. It was his duty to have known the grain was still being withdrawn from the tank, and knowing this to have exercised reasonable care to ascertain it was so nearly

empty as not to be dangerous before ordering it cleaned, and deceased, who was under no duty of inspection, had the right to assume he had done so and that the place was reasonably safe. Olive Hill Fire Brick Co. v. Stone, 153 Ky. 360; Louisa Coal Co. v. Hammond's Admr., 160 Ky. 260; Interstate Coal Co. v. Garrard, 163 Ky. 235.

We do not see how it is possible to deny that from this evidence negligence might be reasonably inferred upon the part of the vice principal in ordering deceased to clean the tank with the assurance it was about empty.

Another reasonable inference from the testimony it seems to us is that this grain had become caked and adhered to the sides of the tank and hopper, for if not so Kelty certainly applied his test carelessly if it is at all dependable. It is only on the assumption that it was caked and stuck on the sides of the tank and that therefore in making the test the bucket missed this quantity of grain, that even good faith can be accorded Mr. Kelty. This condition is also indicated by the physical fact proven that decedent's foot was at the spout and his body completely covered by the grain.

There is no speculation necessary to ascertain the proximate cause of decedent's death, as argued by counsel for defendant; it was caused either by a large quantity of grain falling upon and suddenly engulfing him after he reached the bottom of the tank, or he stepped into and gradually sank below the grain which was at the bottom of the tank before he got there. The one explanation is probable, the other hardly possible, it seems to us, considering the fact that he had disappeared and could not answer when his father returned with the ladder. But in either event, the defendant would be liable if Kelty negligently ordered deceased into the tank when he knew or ought to have known the true conditions, unless the danger was so apparent deceased assumed the risks, or he was himself guilty of contributory negligence.

Whether the danger was apparent to deceased in the dimly lighted and dusty tank was certainly a question for the jury.

The fact relied upon by the trial court as proving contributory negligence as a matter of law, is that deceased, after reaching the bottom of the tank, released the rope from around his body.

That the court was in error in this conclusion is, we think, quite apparent, although it is true that had the decedent not released the rope from about his body he more than likely would not have been killed, because he did not die until he had been removed from the tank after waiting for the grain to run out from over his body, and he could have been pulled out from under the grain much sooner and probably saved had the rope remained about his body. But, even so, the removal of the rope from about his body by the decedent would defeat a cause of action by his personal representative for his death only if its removal was negligence upon the part of the deceased, and not otherwise.

The evidence for plaintiff shows or at least tends to prove that the only purpose of tying the rope about the body of the boy by the father, as ordered by Mr. Kelty, the superintendent, was to prevent an accident from the use of the defective ladder in reaching the bottom of the tank, and that it was not usual or customary or expedient to allow the rope to remain about his body after he had reached the bottom of the tank in safety, because it would have interfered materially with his ability to perform the very service he was sent into the tank to do. To sweep out the bottom of this tank decedent had to climb up the slanting sides of the hopper, which, as shown in the evidence, were made as smooth as possible to prevent grain from adhering thereto, and it is a matter of common knowledge that it would be quite difficult, if not impossible, for anyone to ascend the smooth, sloping sides of the hopper and to sweep same with a rope tied about his body heavy enough to sustain his weight and especially for a man such as deceased, who was six feet tall and weighed between 185 and 200 pounds.

We are therefore sure from the evidence that the question of whether or not the deceased was guilty of contributory negligence in removing the rope from about his body after he had safely reached the bottom of the tank was a question of fact for the jury, and that the court erred in holding that same was as a matter of law contributory negligence. Jones v. South Covington & Cincinnati Street Railway Co., 162 Ky. 176.

Since the fact is clearly established that the defective condition of the ladder had nothing to do with the death

of decedent, the court did not err in refusing to submit the case to the jury on account thereof.

Appellant also complains of the action of the trial court in the exclusion of certain evidence offered.

Jake White was not permitted to testify, as shown by avowal he would have done, that it was the custom in the Kentucky Public Elevator Company at the time Pernie White was sent down to sweep this tank, and for some time prior thereto, for the sweepers to take off the rope after they got down into the bottom of the bin to enable them to do their work properly; that "they used the rope for the purpose of enabling them to go up and down off the ladder after it became out of repair and in bad condition, and would take off the rope as soon as they got down into the bin and began to sweep same. It was necessary to take off the rope in order that he might sweep the bin properly, and he could not do so with any comfort with the rope around him, and this custom had existed and continued for some years past at said elevator company."

This evidence was clearly competent for the purpose of showing whether or not deceased was negligent in removing the rope after he reached the bottom of the tank, because the presence or absence of negligence necessarily depends on what ordinarily prudent persons under like circumstances would have done, and often this can be shown only by proving what is the ordinary or usual way of doing a thing. As said in 20 R. C. L. 30:

"The common experience of mankind is the criterion for determining what cautionary measures shall be taken to avoid injury to others. Everyone may rightfully rely upon experience, and as a rule he is not to be charged with negligence in respect of acts which conform to a practice that has existed for years without resulting in any injury, . . . and subject to some qualifications it is permissible to prove on issue of negligence the usage or practice of others in performing the same act."

This was not an attempt to establish a custom as a binding obligation upon the parties and as forming a part of the contract between them, for the violation of which either party would be liable to the other, but was simply an effort to show what was the ordinary and usual way of performing the work decedent was trying to do in order to determine whether or not he was negligent in

doing it the way he did. The rule requiring a custom to be pleaded before it may be shown in evidence applies where there is an effort to incorporate into a contract a local custom as a binding stipulation between the parties, as was the case in Mowbray & Robinson Company v. Kelly, 170 Ky. 271, relied upon by defendant, but has no application where the purpose is, as here, to prove the ordinary and usual way commonly employed to do a certain thing in order to determine whether or not it has been negligently done.

We also think the court erred in excluding what the witness John Cole said with reference to the condition of the corn at the time of the accident since in our opinion he sufficiently manifested his knowledge of its condition.

For the reasons indicated the judgment is reversed and cause remanded for another trial consistent herewith.