W. B. DAVIS, Grace E. Davis, Camilla Davis and Carolyn Davis Douglas, as Partners doing business as W. B. Davis and Company, Plaintiffs in Error,

v.

Mary Jim WHITSETT, Administratrix of the Estate of Clarence Whitsett, deceased, Defendant in Error.

No. 41110.

Supreme Court of Oklahoma.

Sept. 19, 1967.

As Corrected Dec. 19, 1967.

Rehearing Denied Dec. 19, 1967.

**594**

Leach & Sullivan, Duncan, Fenton, Fenton, Smith & McCaleb, Oklahoma City, for plaintiffs in error.

Richard D. Stone, Waurika, Fischl, Culp & McMillin, Ardmore, for defendant in error.

PER CURIAM:

This appeal involves a judgment, based on a jury verdict, in the amount of $75,000.00, in favor of the plaintiff in an action for the wrongful death of one Clarence Whitsett. Mr. Whitsett died as the result of injuries sustained in an explosion, while he was doing some welding work on the top of a 100-barrel steel tank on an oil and gas lease that was owned and being operated by the defendants. After their motion for a new trial had been overruled, the defendants perfected their appeal to this court.

There was no conflict in the evidence. For several years prior to the explosion the plaintiff's decedent had been in the welding business at Ryan, Oklahoma. He had been engaged by the defendants to do a number of welding jobs on their Spring Lease about twelve miles from Ryan. One of the items involved the welding, to the tank that exploded, of a brace for a riser pipe. The decedent arrived at the lease about noon and, after completing the other contracted items, arrived at the tank involved herein about three o'clock in the afternoon. He made his measurements, fashioned a brace from a piece of pipe that was found near the tank, and went back to the top of the tank to weld the brace to the tank at the edge of the top of the tank. About three-thirty, shortly after he had commenced this welding operation, using his own electric welding equipment, there was an explosion that catapulted the decedent some distance farther in the same general direction. He died of the injuries sustained as the result of such explosion.

The decedent's welding equipment was standard and, according to the defendants' lease superintendent who accompanied the decedent about the lease to show him the various welding jobs to be done, the equipment appeared to be in proper working order while being used on the other

welding jobs on the lease. In doing all of this welding work on this lease, the decedent was acting as an independent contractor and under Magnolia Petroleum Co. v. Barnes, 198 Okl. 406, 179 P.2d 132, was an "invitee" of the defendants for the purpose of doing such work.

The defendants' first proposition, hereinafter stated, involves the invitor-invitee relationship and particularly the duty owed by an invitor to an invitee.

An owner of premises who has engaged an independent contractor to do work on his premises owes to such invitee the duty to keep the premises reasonably safe for the performance of the work. Such duty applies to conditions which are in the nature of a hidden danger, traps, snares, pitfalls and the like which are not ordinarily known to an invitee who, if he does not observe them, can exercise no care to avoid injurious consequences; the owner is under no legal duty to alter the premises so as to eliminate known and obvious dangers, but an owner breaches his duty to an invitee by not warning him of hidden dangers. Magnolia Petroleum Co. v. Barnes, supra. And, as held by this court in the fourth paragraph of its syllabus to E. S. Billington Lumber Co. et al. v. Cheatham, 181 Okl. 402, 74 P.2d 120:

"Although an invitee assumes all normal, ordinary, and obvious risks attendant upon the use of premises, the owner thereof who knows, or in the exercise of reasonable care should know, of their dangerous and unsafe condition owes to such invitee a duty to warn him of the danger where the peril is hidden, latent, or concealed or the invitee is without knowledge thereof."

In the present case there was uncontroverted testimony by witnesses for the plaintiff who had had considerable experience in the use, or the welding, of tanks such as the one involved herein to the effect that explosive gas forms and accumulates above the oil in tanks being used for the storage of oil, and that some remains there even after the oil is pumped from the tank unless special steps are taken to remove the remaining gas so that it is not safe to weld on the outside of such a tank, above the level of the fluid on the inside, unless special steps are first taken to rid the tank of all such remaining gas.

Richard Ray Northrup, who was the defendants' superintendent for the lease on which this incident occurred and who had accompanied the decedent around the lease while he was doing the various welding jobs that were to be done, testified that he had pumped the oil from this tank down to about a foot from the bottom that morning, but that nothing had been done thereafter with respect to ridding the tank of accumulated gas remaining therein. He also testified that as they approached the tank that afternoon for the decedent to do his welding work on the tank he told the decedent that he had pumped the oil from the tank that morning, but he did not tell the decedent whether anything had been done to remove the gas vapor from the tank.

Incidentally, a duly qualified expert who had examined the tank involved herein, both outside and inside, about a week after the explosion, testified that no hole had been burned through the steel of the tank, and that in his opinion (which testimony was not controverted) the explosion occurred on the inside of the tank and was caused by the steel's getting so hot at the point of the welding operation that it became incandescent and ignited the gas in the tank.

We think there can be no doubt but that a dangerous condition existed on the "premises" in question and that it was caused by explosive gas that remained in the tank after the oil had been pumped from the tank, down to about one foot from the bottom.

Thus, the primary question for determination by the jury was whether or not the defendants knew, or should have known, about this dangerous condition, which was not shown to have been known to the decedent. We have already seen that under such circumstances a duty is owed to warn an invitee of such hidden dangers.

The defendants' first proposition for reversal is that the trial court erred in admitting, over the defendants' objection, testimony by witnesses for the plaintiff concerning what the defendants label as a "local custom" among oil operators in the area. The "custom" is one in which the tank-owners, before turning a tank over to a welder to begin welding work, will cause the tank to be made safe for welding, either by having it thoroughly steamed out, ventilated, or filled with water, the purpose being to get rid of all of the accumulated explosive gas.

Defendants argue that the admission of such testimony was erroneous for two reasons: (1) That plaintiff's amended petition framed the issues upon which the plaintiff chose to try the case and it was not alleged therein that the defendants had a duty to perform any of these particular safety operations on the tank before having the decedent start his welding work on it, and it was not alleged that any duty to perform such safety work had been breached by the defendants; and (2) That, even if those allegations had been made, evidence of such "local custom" was not admissible because the plaintiff did not allege the existence of such "local custom," the defendants' duty to abide thereby and the defendants' breach of such duty.

These statements concerning what was not pleaded by the plaintiff are correct. However, defendants do not contend plaintiff's petition failed to allege that the defendants had a duty towards the decedent as their invitee for the purpose of doing the work done and to protect him from, or to warn him of, any hidden danger of which the defendants were aware or should have been aware, and a breach of that duty by the defendants.

The testimony of the first six witnesses next outlined includes, but is not strictly limited to, the testimony under attack in the defendants' first proposition:

Bruce Wininger, a line foreman for Halliburton Company, testified that he was in charge of the welding department for Halliburton and had been for many years, and that in order to make an old tank that has been in use ready for welding it is necessary to "steam them out. We steam them out from 4 to 6 hours, depending on what's to be done." He further testified that after the steaming operation the tanks are safe to be welded upon. He further testified that the welder had nothing to do with the steaming operation. The defendants objected to this testimony as being testimony concerning a local custom not pleaded and saved their exceptions.

William A. Morris, a safety engineer for Sunray DX Oil Company, testified that in order to render an oil field storage tank ready for welding it is necessary to eliminate all combustible and explosive materials from the tank, and that this is done by washing, steaming and removing the bottom residue from the tank. He further testified that upon welding the outside of an oil field storage tank "the first requirement is naturally if they're to weld on the metal is to make sure that you have the wall thickness of the metal, that the metal is thick enough to stand the heat without burning through the vessel; the second thing is to determine the liquid level content of the tank, that being, that we never weld above the liquid level, we weld below the liquid level tank * * * due to the fact that your vapors are present above the liquid level and the vapors are what are explosive." He further testified that at the DX Sunray Plant where he was employed it is not the responsibility of the welder to clean the tank. The defendants moved to strike the testimony of witness Morris, and their motion was overruled and exception allowed.

Travis Hedge, an independent oil producer and lease operator of Jefferson County, Oklahoma, was asked "Will you tell the jury what, if any, steps should be taken to make an oil field storage tank that had been in use ready for welding"? The witness testified that he would remove all of the oil from the tank and would then clean the residue from the bottom of the tank and then "I'd call a steamer and have him come

over here and steam it out." No objection was made to this testimony. The witness further testified that a steamer was available in the area. The defendants moved to strike all of the testimony of the witness Hedge, and their motion was overruled with exceptions.

A. C. O'Neal, a welder of Waurika, Oklahoma, engaged in oil field welding, testified that the accepted method of making a storage tank safe for welding "throughout the industry" was by steaming. "That is absolutely the only sure way to *safeten* a tank would be with steam. Ventilation is another way and another way would be to fill the tank full of water * * *." He further testified that if an operator called a welder and told him the tank was ready for welding "a welder would go ahead and weld on that tank assuming that it had been *safed*." He further testified that steaming units for steaming out tanks were available in the Ryan area.

T. J. Smart, an oil lease operator of approximately ten years' experience who was the pumper on defendants' Spring Lease, testified that in order to prepare an oil tank for welding it was necessary that they be steamed out. He testified that this was necessary to remove the gas and oil which might catch fire and explode. He further testified that there was steaming service available in the area of defendants' lease. He further testified that the usual practice was for the operator of the leases to have the tanks steamed out in preparation for welding.

John Hall, Jr. testified that he was employed as a supervisor for the Halliburton Company, and that used tanks are steamed out prior to welding; that the welder does nothing to determine whether or not the tank has been steamed out.

Very little, if any, of the testimony under attack in this proposition concerns a "local custom." Practically all of it concerns what the particular witness or his company did to rid such a tank of explosive gas before turning it over to a welder, and that, insofar as the witness or his company was con-

cerned, the welder had nothing to do with respect to steaming out the tank. The only testimony under attack in this proposition that might be said to even approach the dignity of a "local custom" was that of Mr. O'Neal, a welder, when he testified that if an operator called a welder and told him that the tank was ready for welding "a welder would go ahead and weld on that tank assuming that it had been *safed*," and that of Mr. Smart, an oil-lease operator, when he testified that the "usual practice" was for the lease operator to have the tanks steamed out in preparation for welding.

However, even assuming that all of the testimony under attack in this proposition concerned a "local custom," we cannot agree with the defendants that it was inadmissible because not pleaded. It was offered only to show what others do in the same circumstances as an aid to the jury in determining whether or not the defendants were guilty of negligence, not to establish directly the ultimate issue of negligence by showing that by violation of such custom or failure to comply therewith the defendants were guilty of negligence equivalent to negligence "per se." Like the testimony of Herbert Dyer, who operated a steamer for a drilling company, that the steamer was available to other operators in the area and that he had used the steamer on tanks on leases owned by these defendants, it tended to show that these defendants knew of the danger involved and were aware of at least one thing that could be done about it. When so used—even if it was testimony concerning a "local custom"—it is no more necessary to plead such evidence than it is to plead any other evidence bearing upon but not of itself establishing negligence. See 151 A.L.R. 324, 340 and 137 A.L.R. 611.

In support of their contention that testimony concerning a local custom or usage, applying to a special or particular class of business, is inadmissible unless the party relying thereon has pleaded such local custom or usage, the defendants cite five Oklahoma cases: Smith v. Stewart et al., 29 Okl. 26, 116 P. 182 (an action on an express,

oral contract); School District No. 22, Love County v. Culwell, 62 Okl. 283, 162 P. 949 (another action on an express contract); Gilbert v. Citizens' National Bank of Chickasha, 61 Okl. 112, 160 P. 635, L.R.A. 1917A, 740 (an action for wrongful conversion of personal property by breach of express contract); Burnett et al. v. Tisdell, Okl., 370 P.2d 924 (an action to quiet title to real property in which the defendant pleaded title by adverse possession); and Sanders v. C. P. Carter Construction Co. et al., 206 Okl. 484, 244 P.2d 822 (a negligence action).

It will be noted that only one of these cases, Sanders v. C. P. Carter Construction Co. et al., was a negligence action.

Analysis of the opinions in the above cited cases discloses that in each one the proof of a breach of some alleged local custom or usage would also establish the existence and a breach of an obligation of the defendant to the plaintiff. The breach in each case was the basis of the plaintiff's claim of damage. The court in the cases applied the rule as set out in Smith v. Stewart et al., supra, as follows:

" * * * it is generally the rule that, before a local custom or a custom or usage applying to a special or particular class of business may be made *the basis of recovery*, it must be pleaded by the party relying on it. * * * "

Sanders v. Carter Construction Co., supra, involved a suit for personal injuries in which plaintiff alleged the existence of a custom regarding the method of loading pipe on a truck and a breach of this custom by defendant which resulted in plaintiff's injuries. The trial court struck the allegations concerning custom upon the ground that it was not also alleged that defendant either had knowledge of the custom or that it was so universal and well-established that a person in defendant's position, in the exercise of ordinary care, should have been aware of such custom.

The reason behind the requirement of the cited cases that the custom be pleaded is that the violation of the custom is the very basis upon which plaintiff's cause of action depends. The same reason does not exist in the case before us.

In this case if the plaintiff relied, for his cause of action, upon the defendants' breach of a custom which required the latter to steam clean a recently used oil tank before permitting a welder to work on it, then clearly the above cited cases would require the pleading of such a duty and the breach thereof. Here, however, the issue is whether or not the defendant knew of the danger and failed to warn plaintiff's decedent of the existence of volatile fumes in the tank, before the latter was advised by the agents of defendants that the tank was "ready" for welding. The evidence was admissible, as we have seen, for the purpose of showing that plaintiff's decedent had no reason to be aware of the existence of such fumes in the tank and for the further purpose of showing that on the contrary defendants did have reason to be aware of such latent defects. Other evidence was also admitted which tended to show defendants did not warn the plaintiff's decedent of the dangerous conditions.

■■ Evidence of local custom is admissible without first pleading it if such custom is not relied upon as the basis of or one of the material issues in plaintiff's cause of action. Where the real and basic issues involve defendants' knowledge of a dangerous condition and a failure to warn invitee of the existence of such danger, evidence of a local custom tending to establish such facts need not be alleged.

The basic rule and the rule as applied in negligence cases finds support in decisions from other jurisdictions. See Hines, Agent v. Talbert (Tex.Civ.App.), 229 S.W. 679; Fish v. Crawford Mfg. Co., 120 Mich. 500, 79 N.W. 793; Harrison v. Birrell, 58 Or. 410, 115 P. 141; Sherwood v. Home Savings Bank, 131 Iowa 528, 109 N.W. 9; Arkadelphia Lbr. Co. v. Asman, 85 Ark. 568, 107 S.W. 1171; Kinney v. Metropolitan Street Ry. Co., 261 Mo. 97, 169 S.W. 23; Brachman v. Brachman, 169 Neb. 650, 100 N.W.2d 774; White's Admin-

istrator v. Kentucky Elevator Co., 186 Ky. 91, 216 S.W. 837; Crooker v. Pacific Lounge & Mattress Co., 34 Wash. 191, 75 P. 632; 17 C.J. § 80, Customs and Usages; 25 C.J.S. Customs and Usages § 32; 38 Am.Jur. §§ 267 and 317, Negligence; 21 Am.Jur.2d § 33, Customs and Usages.

The defendants' first proposition cannot be sustained.

The defendants' second proposition is that the trial court erred in refusing to instruct the jury on assumption of risk. Defendants do not contend that Section 6 of Article 23 of the Oklahoma Constitution requires that the question of assumption of risk, if raised by the pleadings, be submitted to the jury regardless of whether or not there is any evidence to support such a plea. Defendants contend only that there was competent evidence which supported this defense, and, therefore, it should have been submitted to the jury.

The doctrine of "assumption of risk," at least as applied in negligence cases not involving the relationship of master and servant, is based upon the maxim "volenti non fit injuria," so that, in such cases, its application must be strictly limited to the terms of that maxim. Landrum v. Roddy, 143 Neb. 934, 12 N.W.2d 82, 149 A.L.R. 1041. In that case (which involved an injury to an invited passenger in an automobile driven by the defendant), the Nebraska court held, in the sixth paragraph of its syllabus:

"The maxim 'volenti non fit injuria' means: If one, knowing and comprehending the danger, voluntarily exposes himself to it, though not negligent in so doing, he is deemed to have assumed the risk and is precluded from a recovery for an injury resulting therefrom. The maxim is predicated upon the theory of knowledge and appreciation of the danger and voluntary assent thereto."

That maxim is not mentioned in the opinion, but the same principle is expressed by this court in the fifth paragraph of its syllabus to S. H. Kress & Co. v. Maddox, 201 Okl. 190, 203 P.2d 706, (which case involved an injury to an invitee in a store):

"Knowledge of the danger is an essential of the defense of assumption of risk, and the doctrine does not apply unless the one alleged to have assumed the risk can be found to have known or to have been charged with knowledge of the danger."

In the present case, insofar as the defense of assumption of risk is concerned, the risk to be assumed by the decedent was the risk or danger actually in existence because nothing had been done to rid the tank of the explosive gas that naturally remained therein after the oil had been pumped from the tank. Unless the decedent can be found to have known, or to have been charged with knowledge, of the now-established fact that no special steps had been taken to rid this tank of such explosive gas, the defense of assumption of risk can have no application in this case.

Richard Ray Northrup, the defendants' superintendent for the lease involved, testified that on the day before the explosion when he made the arrangements with the decedent to do the welding work on the lease, he told the decedent that they would notify him the following day when they were ready for him to commence the work. He also testified that shortly before noon on the day of the explosion he told his immediate boss, W. B. Davis, a member of the defendant partnership and manager of its oil operations, who was on the lease at the time, that they were ready for the decedent to start his welding work, and Mr. Davis stated that he was going into Ryan for lunch and would so notify the decedent. Mr. Davis was in the court room at the time and had been pointed out and identified by Mr. Northrup, but he was not called as a witness to testify concerning whether or not he had had any conversation with the decedent before he arrived on the lease to do his work, or if so, what had been said in the conversation. At any rate, the decedent arrived at the lease about noon so, in the circumstances, it may reasonably be in-

ferred that Mr. Davis had contacted him and told him that they were ready for him to start his welding work. He found Mr. Davis and Mr. Northrup at the lease warehouse and, at the direct request of Mr. Davis, did a small, unscheduled welding job there at the warehouse. Then, upon being answered in the affirmative when he asked Mr. Northrup, who was to accompany him and show him where the contracted welding work was to be done, if he was ready to get started on such welding work, the decedent, accompanied by Mr. Northrup, did the welding work in connection with the grounding of the electric motors on pumps on fifteen wells scattered over the lease. They also stopped at another oil tank on the lease for the decedent to re-align a brass fitting that he had installed some time before, and when he applied his torch to loosen the fitting, which was below the level of the oil in the tank, oil spurted from the tank and became ignited. The fire was extinguished and the re-alignment completed, and they proceeded to the tank involved herein, arriving there at about three o'clock in the afternoon, no less than three hours after the oil had been pumped from the tank and more than the hour to an hour and a half required to thoroughly steam out such a tank.

Mr. Northrup testified that as they approached this tank he told the decedent that the oil had been pumped out of the tank that morning, and, thinking about the fire at the other tank where there had been no explosion, asked the decedent if it was safe to weld on this tank, and was told by the decedent that there was no danger. He also testified that the valves on the tank were open and oil was being pumped into the tank, and that the decedent must have known about that. However, on cross-examination he admitted that he, the witness, did not hear any oil flowing into the tank. He also testified that neither one of them said anything about whether or not anything had been done towards ridding the tank of explosive gas.

Whether or not the decedent negligently took a chance on proper safety precautions having been taken, in apparently assuming that they had been and proceeding with his welding work without even asking about that matter, is not involved in this proposition. That was involved in the questions of negligence, primary and contributory, on the part of the decedent, and instructions were given on those questions.

■ The facts in evidence would not support a finding that the decedent knew, or was charged with knowledge, of the fact that nothing had been done to rid the tank of explosive gas that remains after oil has been pumped from the tank, and knowingly and voluntarily assumed the risk involved. Consequently, the defense of assumption of risk has no application in this case, and the defendants' second contention cannot be sustained.

The defendants' third proposition is that the trial court erred in permitting the plaintiff to show that the action was brought by permission of the county court that had appointed the plaintiff as administratrix of the estate of the decedent involved.

After the plaintiff had identified herself and the letters of administration issued to her by the County Court of Jefferson County, Oklahoma, had been offered and received in evidence, her counsel asked her "Did you go to the County Judge down at Waurika and get permission to bring this suit?" When the defendants objected to this question, on the ground that there is no way that any other court can give or refuse permission to bring this kind of suit, plaintiff's counsel stated "She's the administratrix and the question is, was the suit brought on the order of the court." Defendants objected to this statement by counsel and moved that the jury be instructed not to consider it, because highly prejudicial. This objection was overruled, after a statement by plaintiff's counsel that there was some thinking along the line that an administrator must get permission of the county court to bring such a suit.

The plaintiff then answered affirmatively the following questions: "Did you go to the County Judge and get permission to bring suit?" "And your contract was approved, is that right?" and "And the one you made with your attorneys?" The defendants renewed their objection to such testimony and moved that it be stricken, and same were overruled.

Defendants contend that this testimony and the above-quoted statement by plaintiff's counsel were prejudicial because they would undoubtedly leave the impression in the minds of the jurors that the county court had reviewed the merits of the action and gave its approval and blessing to the bringing of the action, because it thought that the administratrix should recover in the action.

▮▮▮▮ Defendants' counsel had an opportunity, in arguing the case to the jury, to negative this idea by explaining the situation and that the county court's order of approval in such an instance does not infer any consideration of the merits of the action to be brought thereunder. The case-made on appeal does not include the argument by counsel to the jury, so we cannot say whether or not defendants' counsel took advantage of such opportunity. Particularly, in view of this opportunity—whether taken advantage of or not—we cannot say that the error, if it were error, in overruling the defendants' objections and motions involved in this proposition was prejudicial to the defendants. An error does not require reversal unless an examination of the entire record discloses that a miscarriage of justice has probably resulted therefrom or that there was a violation of constitutional or statutory rights. A. A. Murphy, Inc. v. Banfield et al. Okl., 363 P.2d 942.

We find no merit in the defendants' third proposition.

It is asserted by the defendants under their fourth proposition that the verdict was excessive, appearing to have been made under the influence of passion and prejudice.

▮▮▮▮ In this case the decedent was thirty-two years of age and had a life expectancy of forty-two years. He was in good health, had a high school education, was a welder by trade, and the general tenor of the testimony was to the effect that he was an active, hard-working individual, and prior to engaging in the work of an independent welding contractor, he was employed at a salary of $400.00 per month. His gross income as an independent contractor averaged $500.00 per month, and it was reasonable for the jury to assume that his earnings would have increased. This court has stated in many opinions that when a verdict is attacked on the grounds that it is excessive, this court will not disturb the same unless the jury has committed some gross or palpable error, or acted under bias, influence or prejudice, or has totally ignored the rule of law by which damages are awarded. The rule stated by this court in the third paragraph of its syllabus of Parkhill Trucking Co. et al. v. Hopper, 208 Okl. 429, 256 P.2d 810, is applicable here. There, the court said:

"The amount of damages recoverable in a death case is always a question of fact for the jury and the verdict of the jury will not be disturbed unless it appears from the record that the jury was swayed by passion and prejudice against the losing party, and unless the recovery is so large as to shock the sense of justice."

The record does not disclose such a situation in this case.

The defendant-in-error has requested, by appropriate motion in his brief, that summary judgment be rendered against the surety on the supersedeas bond posted by plaintiff-in-error. This motion is proper and said judgment is hereby entered with direction that the same be enforced by the trial court as though therein rendered.

Judgment affirmed.

The Court acknowledges the services of RICHARD L. GOSSETT, who with the

aid and counsel of WILLIAM H. LAY-DEN and JAMES M. MAY, as Special Masters, prepared a preliminary advisory opinion. These attorneys had been recommended by the Oklahoma Bar Association and appointed by the Court. THE CHIEF JUSTICE then assigned the case to LAVENDER, J. for review and study, after which, and upon consideration by the Court, the foregoing opinion was adopted.

All the Justices concur.